**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| MOHAMMED FOTOUHI, derivatively on behalf of IMPINJ, INC., | |
| Plaintiff, | C.A. No.: |
| vs. | |
| CHRIS DIORIO, ERIC BRODERSEN, EVAN FEIN, GREGORY SESSLER, TOM A. ALBERG, CLINTON BYBEE, PETER VAN OPPEN, and THERESA WISE, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| IMPINJ, INC., | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiff Mohammed Fotouhi ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Impinj, Inc. ("Impinj" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Chris Diorio, Eric Brodersen, Evan Fein, Gregory Sessler, Tom A. Alberg, Clinton Bybee, Peter van Oppen, and Theresa Wise (collectively, the "Individual Defendants" and together with Impinj, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Impinj, unjust enrichment, and violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's

attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Impinj, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Impinj's directors and officers from November 3, 2016 through the present (the "Relevant Period").

2.      Impinj provides a platform comprised of integrated circuit tags ("endpoint ICs"), connectivity, and software that together deliver item data to business applications.  The Company links the layers of its platform to deliver advanced capabilities and performance that surpass mix-and-match solutions built from competitor products, and within each layer sells one or more product families.

3.      Impinj's endpoint ICs allow users to determine an item's identity, authenticity, and location when attached to an item, and are essential to the Company providing its platform.

4.      During the Relevant Period, Impinj repeatedly expressed to the investing public that the Company had strong demand for its endpoint ICs, which led to the reporting of growing sales which the Company claimed was a sign of increased customer adoption of the Company's products.

5.      The truth, however, was that the Company's strong reported sales were the byproduct of customer orders moving ahead of actual production and use as a result of increased production lead times.

6.     In mid to late 2017, supply constraints that the Company experienced began to lessen, resulting in customers changing their orders and the Company's backlog decreasing in line with shorter lead times.  As this was occurring, the truth slowly began to emerge.

7.     On August 2, 2018, Impinj issued a press release announcing that the Company would delay its earnings release, earnings call, and the filing of its quarterly report on Form 10-Q with the SEC for its second quarter ended June 30, 2018.  Moreover, the press release announced that the Company had received a complaint from a former employee, upon which the Audit Committee commenced an independent investigation.

8.     On this news, the price per share of Impinj common stock fell $3.02 per share, or 13.7%, from the previous day's trading price, closing at $18.97 per share on August 3, 2018.

9.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

10.     Also during the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to Impinj, willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company's significant increase in customers in 2016 weakened the Company's ability to fulfill production obligations to its customers, resulting in production lead times twice as high as Impinj's normal baseline lead times; (2) higher sales of endpoint ICs by Impinj were not indicative of increased product adoption propelling strong demand, and instead were the byproduct of customers buying more inventory to account for extended lead times; (3) Impinj was engaged in misconduct that led to an employee complaint and the commencement of an independent investigation by the Audit Committee; and (4) the Company

failed to maintain internal controls.  As a result of the foregoing, Impinj's public statements were materially false and misleading at all relevant times.

11.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected the Company, its Chief Executive Officer ("CEO"), its Chief Operating Officer, and its former Chief Financial Officer ("CFO") to two federal securities fraud class action lawsuits pending in the United States District Court for the Western District of Washington (the "Securities Class Actions"), the need to undertake internal investigations, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, and is costing the Company millions of dollars.

13.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

14.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of one of the directors' liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Impinj Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

16.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because Impinj is incorporated in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Impinj. Plaintiff has continuously held Impinj common stock at all relevant times.

### Nominal Defendant Impinj

21.     Nominal Defendant Impinj is a Delaware corporation headquartered at 400 Fairview Avenue North, Suite 1200, Seattle, Washington 98109. Impinj stock trades on the NASDAQ under the ticker symbol "PI."

**Defendant Diorio**

22.     Defendant Chris Diorio ("Diorio") has served as the Company's CEO since November 2014 and as Vice Chair of the Board since September 2013.  He has served as a Company director since April 2000 and previously served as the Company's Chief Strategy and Technology Officer from September 2013 to November 2014.  He is also a co-founder of the Company.  According to the Company's Schedule 14A filed with the SEC on July 2, 2018 (the "2018 Proxy Statement"), as of May 31, 2018, Defendant Diorio beneficially owned 1,115,454 shares of the Company's common stock, which represented 5.2% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 31, 2018 was $17.90, Diorio owned over $19.9 million worth of Impinj stock.

23.     For the fiscal year ended December 31, 2017, Defendant Diorio received $2,164,308 in compensation from the Company. This included $355,000 in salary, $1,803,780 in option awards, and $7,527 in all other compensation.

24.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Diorio made the following sale of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| December 7, 2016 | 80,000 | $ 27.00 | $ 2,160,000 |

25.     His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

26.     The Company's 2018 Proxy Statement stated the following about Defendant Diorio:

*Chris Diorio, Ph.D.,*[1] one of our co-founders, has served as a member of our board of directors since April 2000, as chief executive officer since November 2014 and as vice chair since September 2013. Previously, he served as our chief strategy and technology officer from September 2013 to November 2014, chief technology officer from November 2006 to September 2013, chair from April 2000 to January 2013, vice president of engineering from 2004 to 2006 and as a consultant to us from April 2000 to June 2004. In addition, he is an affiliate professor of computer science and engineering at the University of Washington, a director and former chair of the RAIN RFID Alliance and former director of Bluegiga Technologies Ltd. Dr. Diorio received a B.A. in physics from Occidental College and an M.S. and Ph.D. in electrical engineering from the California Institute of Technology. We believe Dr. Diorio's perspective, experience and institutional knowledge as our co-founder, vice chair and chief executive officer qualify him to serve as director.

### Defendant Brodersen

27.     Defendant Eric Brodersen ("Brodersen") has served as the Company's President and Chief Operating Officer since November 2014.  He previously served as the Company's Executive Vice President of Sales and Marketing from September 2014 to November 2014, and as the Company's Senior Vice President of Business Development and Chief Marketing Officer from April 2014 to September 2014.  According to the Company's 2018 Proxy Statement, as of May 31, 2018, Defendant Brodersen beneficially owned 246,285 shares of the Company's common stock, which represented 1.1% of the Company's outstanding stock as of that date. Given that the price per share of the Company's common stock at the close of trading on May 31, 2018 was $17.90, Brodersen owned over $4.4 million worth of Impinj stock.

28.     For the fiscal year ended December 31, 2017, Defendant Brodersen received $1,228,830 in compensation from the Company. This included $322,500 in salary, $901,890 in option awards, and $4,440 in all other compensation.

---

[1] Emphasis in original throughout.

29.    During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Brodersen made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| December 27, 2017 | 2,700 | $ 29.32 | $ 79,164 |
| December 28, 2017 | 2,700 | $ 28.66 | $ 77,382 |
| March 21, 2017 | 2,700 | $ 28.65 | $ 77,355 |
| March 22, 2017 | 2,700 | $ 28.08 | $ 75,816 |
| April 19, 2017 | 2,700 | $ 34.71 | $ 93,717 |
| April 20, 2017 | 7,500 | $ 35.58 | $ 266,850 |
| May 3, 2017 | 3,500 | $ 36.45 | $ 127,575 |
| May 4, 2017 | 3,500 | $ 37.33 | $ 130,655 |
| June 13, 2017 | 3,500 | $ 47.11 | $ 164,885 |
| June 14, 2017 | 3,500 | $ 46.62 | $ 163,170 |
| July 17, 2017 | 3,500 | $ 53.84 | $ 188,440 |
| July 18, 2017 | 3,500 | $ 53.39 | $ 186,865 |
| August 28, 2017 | 3,500 | $ 35.48 | $ 124,180 |
| August 29, 2017 | 3,500 | $ 35.85 | $ 125,475 |
| September 20, 2017 | 3,500 | $ 39.53 | $ 138,355 |
| September 21, 2017 | 3,500 | $ 40.22 | $ 140,770 |
| October 12, 2017 | 3,500 | $ 37.47 | $ 131,145 |
| October 13, 2017 | 3,500 | $ 36.57 | $ 127,995 |
| November 16, 2017 | 2,700 | $ 25.64 | $ 69,228 |
| November 17, 2017 | 2,700 | $ 25.23 | $ 68,121 |

30.    Thus, in total, before the fraud was exposed, he sold 68,400 Company shares on inside information, for which he received over $2.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

31.    The Company's 2018 Proxy Statement stated the following about Defendant Brodersen:

*Eric Brodersen* has served as our president and chief operating officer since November 2014. Previously, he served as our executive vice president of sales and marketing from September 2014 to November 2014, and senior vice president of business development and chief marketing officer from April 2014 to September

2014. Prior to joining us, Mr. Brodersen was senior vice president at EMC Corporation, a data storage company, where he was the lead marketing, business development and services executive for the Isilon Storage Division from December 2010 to April 2014. He served as senior vice president for marketing and business development for Isilon Systems, Inc. prior to its acquisition by EMC Corporation in 2010. From April 2009 to July 2010, Mr. Brodersen served as senior vice president of worldwide sales for Quantum Corporation, a data storage company. Mr. Brodersen received a B.A. in government from Harvard College and an M.B.A. from the University of Michigan.

**Defendant Fein**

32.     Defendant Evan Fein ("Fein") served as the Company's Chief Financial Officer from November 2010 to March 30, 2018.  According to the Company's 2018 Proxy Statement, as of May 31, 2018, Defendant Fein beneficially owned 111,963 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2018 was $17.90, Fein owned over $2 million worth of Impinj stock.

33.     For the fiscal year ended December 31, 2017, Defendant Fein received $967,978 in compensation from the Company. This included $278,750 in salary, $631,323 in option awards, and $3,833 in all other compensation.

34.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Fein made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| March 1, 2017 | 13,124 | $ 28.83 | $ 378,365 |
| May 5, 2017 | 10,207 | $ 41.89 | $ 427,571 |
| June 1, 2017 | 9,000 | $ 43.68 | $ 393,120 |
| June 16, 2017 | 10,000 | $ 53.20 | $ 532,000 |
| September 1, 2017 | 9,000 | $ 37.99 | $ 341,910 |
| December 1, 2017 | 3,300 | $ 25.19 | $ 83,127 |
| January 22, 2018 | 5,700 | $ 25.02 | $ 142,614 |

35.     Thus, in total, before the fraud was exposed, he sold 60,331 Company shares on inside information, for which he received over $2.2 million. His insider sales made with knowledge

of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

36.     The Company's Schedule 14A filed with the SEC on April 21, 2017 stated the following about Defendant Fein:

> *Evan Fein* has served as our chief financial officer since November 2010. Previously, he served as our senior vice president, finance and administration from June 2009 to November 2010, vice president, finance and administration from February 2004 to June 2009, and director of finance from October 2000 to February 2004. Prior to joining us, Mr. Fein managed the financial planning and corporate development activities of T-Mobile US, Inc., a telecommunications provider. Mr. Fein received a B.S. in mathematics and an M.B.A. from the University of Washington.

**Defendant Sessler**

37.     Defendant Gregory Sessler ("Sessler") has served as a Company director since April 2011.  He also serves as the Chair of the Audit Committee.  According to the Company's 2018 Proxy Statement, as of May 31, 2018, Defendant Sessler beneficially owned 27,081 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 31, 2018 was $17.90, Sessler owned over $484,749 worth of Impinj stock.

38.     For the fiscal year ended December 31, 2017, Defendant Sessler received $162,653 in compensation from the Company. This included $45,000 in fees earned or paid in cash and $94,150 in stock awards.

39.     The Company's 2018 Proxy Statement stated the following about Defendant Sessler:

> *Gregory Sessler* has served as a member of our board of directors and as chair of our audit committee since April 2011. Mr. Sessler is the president and chief executive officer and former chief financial officer of Spiration, Inc., a medical device company (acquired by Olympus Corporation of the Americas in 2010), which he joined in 2002. Previously, Mr. Sessler served as senior vice president

and chief financial officer of Rosetta Inpharmatics, Inc., a biotechnology company (acquired by Merck & Co. in 2001), chief financial officer of Sonus Pharmaceuticals, Inc. (now Achieve Life Sciences, Inc.), a pharmaceutical company, and chief financial officer of MicroProbe Corporation, a biotechnology company. Mr. Sessler previously served as chair of the audit committee of Marina Biotech, Inc. and as a member of the audit committee of Corixa Corporation (acquired by GlaxoSmithKline plc). Mr. Sessler received a B.S. in accounting from Syracuse University and an M.B.A. from the Stanford Graduate School of Business. We believe Mr. Sessler's financial and accounting expertise, including his service as chief financial officer of four publicly-traded companies, qualify him to serve as director and as audit committee chair.

**Defendant Alberg**

40.     Defendant Tom A. Alberg ("Alberg") has served as a Company director since September 2000.  He also serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee.  According to the Company's 2018 Proxy Statement, as of May 31, 2018, Defendant Alberg beneficially owned 146,805 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 31, 2018 was $17.90, Alberg owned over $2.6 million worth of Impinj stock.

41.     For the fiscal year ended December 31, 2017, Defendant Alberg received $129,150 in compensation from the Company. This included $35,000 in fees earned or paid in cash and $94,150 in stock awards.

42.     The Company's 2018 Proxy Statement stated the following about Defendant Alberg:

*Tom A. Alberg* has served as a member of our board of directors since September 2000. Mr. Alberg has been a managing director of Madrona Venture Group, LLC, a venture capital firm, since September 1999, and a principal in Madrona Investment Group, LLC, a private investment firm, since January 1996. Prior to co-founding Madrona Investment Group, Mr. Alberg served as president of LIN Broadcasting Corporation, executive vice president of McCaw Cellular Communications, Inc., and executive vice president of AT&T Wireless Services. Previously, he was chair of the executive committee and partner at Perkins Coie, the Northwest's largest law firm. Since 1996, Mr. Alberg has served as a director of Amazon.com, Inc., a publicly traded online retailer. Mr. Alberg received a B.A.

in international affairs from Harvard College and a J.D. from Columbia Law School. We believe Mr. Alberg's experience as a venture capitalist investing in technology companies, through which he gained experience with emerging technologies, his experience as a lawyer, and skills relating to financial statement and accounting matters, qualify him to serve as director.

**Defenant Bybee**

43.     Defendant Clinton Bybee ("Bybee") has served as a Company director since January 2008.  He also serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee.  According to the Company's 2018 Proxy Statement, as of May 31, 2018, Defendant Bybee beneficially owned 1,371,152 shares of the Company's common stock, which represented 6.4% of the Company's outstanding stock as of that date.  Given that the price per share of the Company's common stock at the close of trading on May 31, 2018 was $17.90, Bybee owned over $8.7 million worth of Impinj stock.

44.     For the fiscal year ended December 31, 2017, Defendant Bybee received $139,150 in compensation from the Company. This included $45,000 in fees earned or paid in cash and $94,150 in stock awards.

45.     The Company's 2018 Proxy Statement stated the following about Defendant Bybee:

> *Clinton Bybee* has served as a member of our board of directors since January 2008 and chair of our compensation committee since July 2014. He is a managing director of ARCH Venture Partners, a venture capital firm he joined in June 1994. Mr. Bybee has helped organize, finance and develop numerous companies and is a board member of several privately-held companies. Mr. Bybee is an organizing member of the Texas Venture Capital Association and served on the board of directors and audit committee of Xtera Communications, Inc., a publicly traded fiber optics company, from August 2007 to September 2017. Previously, Mr. Bybee held various engineering positions with Amoco Corporation. Mr. Bybee received a B.S. in petroleum engineering from Texas A&M University and an M.B.A. from the University of Chicago. We believe that Mr. Bybee's experience

as a venture capital investor, including his service on the board of directors of multiple companies, qualifies him to serve as director.

**Defendant van Oppen**

46.     Defendant Peter van Oppen ("van Oppen") has served as a Company director since January 2013, and serves as the Board's Chair.  He also serves as a member of the Nominating and Corporate Governance Committee.  According to the Company's 2018 Proxy Statement, as of May 31, 2018, Defendant van Oppen beneficially owned 97,773 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on May 31, 2018 was $17.90, van Oppen owned over $1.7 million worth of Impinj stock.

47.     For the fiscal year ended December 31, 2017, Defendant van Oppen received $162,653 in compensation from the Company. This included $45,000 in fees earned or paid in cash and $117,653 in stock awards.

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant van Oppen made the following sales of Company stock:

| Date | Number of Shares | Price | Proceeds |
|------|-----------------|-------|----------|
| May 17, 2017 | 25,000 | $ 39.37 | $ 984,250 |
| May 1, 2017 | 24,166 | $ 44.33 | $ 1,071,279 |

49.     Thus, in total, before the fraud was exposed, he sold 49,166 Company shares on inside information, for which he received over $2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

50.     The Company's 2018 Proxy Statement stated the following about Defendant van Oppen:

*Peter van Oppen* has served as our chair and a member of our board of directors since January 2013. Mr. van Oppen has been a partner at Trilogy Partnership, a private investment firm focused on technology and telecommunications, since 2006. Prior to joining Trilogy, Mr. van Oppen served as chair and chief executive officer of Advanced Digital Information Corporation, or ADIC, a publicly-traded storage management software company, from 1994 through its acquisition by Quantum Corp. in 2006. Prior to ADIC, Mr. van Oppen served as president and chief executive officer of Interpoint, a predecessor company to ADIC, from 1989 until its acquisition by Crane Co. in October 1996, and has also been a consultant at PricewaterhouseCoopers LLP and Bain & Company. He is a former director of Level 3 Communications, Inc., Isilon Systems, Inc., Western Wireless Corporation and other public companies. Mr. van Oppen currently serves as a vice chair of the UW Medicine Board and as chair of its Finance and Audit Committee, is former chair of the board of trustees and former chair of the investment committee at Whitman College and serves on the board of directors of several private companies. In addition, Mr. van Oppen has supervised public company chief financial officers and is a member, on inactive status, of the American Institute of Certified Public Accountants. He is also a former director of Seattle Branch, Federal Reserve Bank of San Francisco. Mr. van Oppen received a B.A. in political science from Whitman College and an M.B.A. from Harvard Business School, where he was a Baker Scholar. We believe Mr. van Oppen is qualified to serve as chair because of his experience as a chair and chief executive officer of a global data storage company for over a decade, his extensive management and consulting experience, as well as his experience as a director of other public and private companies.

**Defendant Wise**

51.     Defendant Theresa Wise ("Wise") has served as a Company director since May 2016. She also serves as a member of the Compensation Committee. According to the Company's 2018 Proxy Statement, as of May 31, 2018, Defendant Wise beneficially owned 16,666 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on May 31, 2018 was $17.90, Wise owned over $298,321 worth of Impinj stock.

52.     For the fiscal year ended December 31, 2017, Defendant Wise received $124,150 in compensation from the Company. This included $30,000 in fees earned or paid in cash and $124,150 in stock awards.

53.     The Company's 2018 Proxy Statement stated the following about Defendant Wise:

*Theresa Wise* has served as a member of our board of directors since May 2016. Ms. Wise was senior vice president and chief information officer for Delta Air Lines, Inc., a publicly traded airline company, from October 2008 to April 2016. Prior to joining Delta, Ms. Wise held a number of positions at Northwest Airlines Corporation, a formerly publicly traded airline company, including serving as the company's chief information officer from 2001 until Northwest Airlines Corporation's merger with Delta Air Lines in 2008. Ms. Wise received a B.A. in mathematics and chemistry from St. Olaf College and a Ph.D. and M.S. in applied math from Cornell University. We believe Ms. Wise's experience as a senior officer at public companies qualifies her to serve as a director.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

54.     By reason of their positions as officers and/or directors of Impinj and because of their ability to control the business and corporate affairs of Impinj, the Individual Defendants owed Impinj and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Impinj in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Impinj and its shareholders so as to benefit all shareholders equally.

55.     Each director and officer of the Company owes to Impinj and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

56.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Impinj, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

57.     To discharge their duties, the officers and directors of Impinj were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

58.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good

faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Impinj, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Impinj's Board at all relevant times.

59.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

60.     To discharge their duties, the officers and directors of Impinj were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Impinj were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Florida, and the United States, and pursuant to Impinj's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Impinj conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Impinj and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Impinj's operations would comply with all applicable laws and Impinj's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

61.      Each of the Individual Defendants further owed to Impinj and the shareholders the duty of loyalty requiring that each favor Impinj's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

62.      At all times relevant hereto, the Individual Defendants were the agents of each other and of Impinj and were at all times acting within the course and scope of such agency.

63.      Because of their advisory, executive, managerial, and directorial positions with Impinj, each of the Individual Defendants had access to adverse, non-public information about the Company.

64.      The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Impinj.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

65.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

66.      The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants'

Case 1:18-cv-01686-RGA   Document 1   Filed 10/26/18   Page 19 of 60 PageID #: 19

violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.

67.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Impinj was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

68.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

69.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Impinj, and was at all times acting within the course and scope of such agency.

## IMPINJ'S CODE OF CONDUCT

70.     The Company's Code of Business Conduct and Ethics (the "Code of Conduct"), adopted on June 16, 2016, provides that "[a]ll Company directors, officers and employees (who, unless specified otherwise, are collectively 'employees'), as well as Company contractors, consultants and agents shall abide by this Code."

71.     The Code of Conduct provides, as to Impinj's "General Standard of Conduct," that:

All employees, contractors, consultants and agents shall act in an honest, ethical and lawful manner in all Company and personal business.

72.     The Code of Conduct provides, as to complying with the law, that:

You must follow all laws, rules, regulations and regulatory orders that apply to the Company and the Company's business, including environmental, employment and workplace safety laws, as well as any laws described in Section 10. You should know, and if you don't know then learn, the legal requirements relating to your duties at a level sufficient to enable you to recognize potential dangers and when to seek advice from your supervisor or the General Counsel.

If you violate laws, rules, regulations or orders, then you may have criminal or civil liability, and be subject to prosecution, in addition to being disciplined by the Company. Violations may also subject the Company to civil or criminal liability or loss of business. If you have any questions about whether an activity is restricted or prohibited, seek assistance before your take action, including before giving any verbal assurances that might be pertain to the legality of an action or behavior.

73.     The Code of Conduct provides, as to communicating accurately and responsibly,

that:

The Company's <u>External Communication Policy</u> describes who may communicate Company information to the public, press, market professionals (e.g. securities analysts, institutional investors, investment advisors, brokers and dealers) and security holders. You must abide by this policy.
Business communications can become public. Avoid exaggeration, guesswork, derogatory remarks or inappropriate characterizations of people and companies in all communication including verbal as well as written.

74.     The Code of Conduct states, as to satisfying financial reporting requirements, that:

The law requires the Company to follow strict accounting standards, report financial information accurately and completely, and have strong internal controls over its financial transactions and records. The following policies complement the Company's Disclosure Controls and Procedure in satisfying legal reporting requirements.

75.     The Code of Conduct states that those under its purview must "[m]aintain accurate

records/reports and comply with reporting requirements," stating:

You must use all reasonable effort to ensure that every business record or report you create or review is accurate and complete. It is the Company's policy to record, classify and summarize all transactions in the Company's financial statements, books and records in accordance with all applicable principles, standards, laws, rules and regulations, policies, controls and procedures for accounting and financial reporting. If you are involved with financial reporting or accounting, you must have an appropriate understanding of, and should in good faith adhere to, such financial reporting requirements. If you are a senior officer, then you must ensure that appropriate internal controls and procedures are in place, understood and followed. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely. Anyone representing or certifying as to the accuracy of such records and reports should make an inquiry or review adequate to establish a good faith belief in their accuracy. Even if you are not directly involved in financial reporting or accounting, the Company expects you to use all reasonable efforts to ensure that every business record or report with which you deal is accurate, complete and reliable.

76.    The Code of Conduct states that those under its purview must "[e]xercise due care"

and must not make intentional misrepresentations, stating:

You may not intentionally misrepresent the Company's financial results nor compromise the integrity of the Company's reports, records, prices and procedures. For example, you may not:

- report or enter information in the Company's books or records that hides, misrepresents or disguises the true nature of a financial or nonfinancial transaction or result;

- establish an undisclosed or unrecorded fund, account, asset or liability for an improper purpose;

- enter into a transaction or agreement that accelerates, postpones or otherwise manipulates accurate and timely revenue and expense recording;

- intentionally misclassify transactions to accounts, business units or accounting periods; or

- knowingly assist others in any of the above.

77.    This Code of Conduct notes that those under its purview have an obligation to

investigate and report potential violations, stating:

You potentially have civil or criminal liability, and put the Company at risk, if your conduct leads to a violation. Such misconduct includes, for example:

- providing financial results inconsistent with underlying business performance;

- providing inaccurate financial records including individual employee reports;

- circumventing mandated review and approval procedures; or

- improperly influencing financial, accounting or other personnel, external or internal auditors.

You must report any suspected financial, operational or other misrepresentation or impropriety to your supervisor or an appropriate Company officer promptly.

78.   In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act.  Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

79.   Impinj provides a platform comprised of endpoint ICs, connectivity, and software that together deliver item data to business applications.  The Company links the layers of its platform to deliver advanced capabilities and performance that surpass mix-and-match solutions built from competitor products, and within each layer sells one or more product families.

80.     Impinj's endpoint ICs allow users to determine an item's identity, authenticity, and location when attached to an item, and are essential to the Company providing its services.

**False and Misleading Statements**

*November 3, 2016 Press Release*

81.     On November 3, 2016, the Company issued a press release announcing its financial results for its fiscal third quarter ended September 30, 2016.  The press release noted accelerated demand for the Company's endpoint ICs, stating, in relevant part:

> "We delivered a strong third quarter, exceeding our revenue and earnings guidance. Revenue in the quarter grew 50% year-over-year to reach a record $31.0 million, driven primarily by accelerating demand for our endpoint ICs, followed by growing demand for our connectivity products. We view endpoint IC volumes as an indicator of market adoption and are excited by the broad-based demand we saw this quarter," said Chris Diorio, Impinj co-founder and CEO. "We will continue investing in this massive market opportunity to enhance our leading market position and foster adoption of our platform."

82.     The press release additionally provided promising guidance for the next fiscal quarter, stating, in relevant part:

For the fourth quarter of 2016, Impinj currently expects:

- Revenue in the range of $31.5 million to $33.0 million
- Adjusted EBITDA in the range of $0.75 million to $2.25 million
- Non-GAAP net income in the range of $0.75 million to $2.25 million, and non-GAAP diluted earnings per share in the range of $0.04 and $0.11 using approximately 20.2 million shares

*November 3, 2016 Earnings Call*

83.     On November 3, 2016, the Company held an earnings call discussing its financial results for its fiscal third quarter.  During the call, Defendant Diorio stated that the Company sees "endpoint IC volumes as an indicator of RAIN market adoption" and that Impinj is "excited by the accelerating demand [it] [is] seeing."

84.    Also during the call, Defendant Fein commented on the Company's reported revenue of $31 million, noting that it was "50% growth over the third quarter of 2015 and 19.3% growth over the prior quarter."  Fein also noted that "[w]e use several methods to conduct inventory levels" and "work[ ] closely with our largest inlay customers, and we're in a position now were our customers are desiring their endpoint ICs in very rapid fashion, so we feel comfortable that inventory levels are low."  Moreover, Defendant Fein noted that the "visibility we've got, combined with the short lead time orders we're seeing from many of those customers, give us real confidence in the strong demand."

### February 16, 2017 Earnings Call

85.    On February 16, 2017, the Company held an earnings call to discuss its financial results for its fiscal quarter and year ended December 31, 2016.  During the call, Defendant Diorio stated, "[a]s we've noted in prior calls, we view endpoint IC volumes as an indicator of RAIN market adoption and are excited by the demand we're seeing."

86.    During the call, Defendant Fein reported revenue of $33.7 million and noted that it was "ahead of our guidance and representing 49% growth over the fourth quarter of 2015."  Fein noted that the growth "was driven primarily by increasing demand for our endpoint ICs." Moreover, Fein noted that "[f]or the full year, we grew revenue 43% to reach $112.3 million" and that the Company's "endpoint IC volume for the year grew to $6 billion, roughly a 70% increase over the prior year's $3.5 billion."  Defendant Fein also noted during the call that "[w]e remain on track to reach our target model in 2019 to 2020 with endpoint IC revenue greater than 60% of our total."

### April 21, 2017 Proxy Statement

87.     On April 21, 2017, the Company filed a Schedule 14A with the SEC (the "2017 Proxy Statement").  Defendants Diorio, Sessler, Alberg, Bybee, van Oppen, and Wise solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

88.     The 2017 Proxy Statement stated, regarding the Company's Code of Conduct, that:

Our board of directors has adopted corporate governance guidelines. These guidelines address, among other items, the responsibilities of our directors, the structure and composition of our board of directors and corporate governance policies and standards applicable to us in general. In addition, our board of directors has adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including our chief executive officer, chief financial officer, and other executive and senior financial officers.

89.     The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public.

90.     The Individual Defendants also caused the 2017 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "performance metrics" while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

91.     Further, the 2017 Proxy Statement failed to disclose that: (1) the Company's significant increase in customers in 2016 weakened the Company's ability to fulfill production

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

obligations to its customers, resulting in production lead times twice as high as Impinj's normal

baseline lead times; (2) higher sales of endpoint ICs by Impinj were not indicative of increased

product adoption propelling strong demand, and instead were the byproduct of customers buying

more inventory to account for extended lead times; (3) Impinj was engaged in misconduct that led

to an employee complaint and the commencement of an independent investigation by the Audit

Committee; and (4) the Company failed to maintain internal controls.

### *May 4, 2017 Press Release*

92.     On May 4, 2017, the Company issued a press release announcing its financial

results for its first fiscal quarter ended March 31, 2017.  The press release stated, in relevant part:

**First Quarter 2017 Financial Summary**

- Revenue grew 47% year-over-year to $31.7 million
- GAAP gross margin of 52.9%; non-GAAP gross margin of 54.2%
- GAAP net loss of $2.2 million, or loss of $0.11 per diluted share using 20.3 million shares
- Adjusted EBITDA of $0.2 million
- Non-GAAP net income of $0.1 million, or income of $0.01 per diluted share using 21.7 million shares

93.     As to the Company's guidance for the second quarter, the press release stated, in

relevant part:

For the second quarter of 2017, Impinj currently expects:

- Revenue in the range of $32.4 million to $33.9 million
- Adjusted EBITDA in the range of a loss of $0.6 million to income of $0.9 million
- Non-GAAP earnings in the range of a loss of $0.5 million to income of $1.0 million, and non-GAAP diluted earnings per share in the range of a loss of $0.02 to income of $0.05 with an expected share count in the range of 21 million to 22 million shares

### *May 4, 2017 Earnings Call*

94.     On May 4, 2017, the Company also held an earnings call to discuss its first quarter

results.  During the call, Defendant Diorio stated, in relevant part:

> We delivered a strong first quarter, with revenue growing 47% year over year to
> $31.7 million, just above the top end of our guidance. All layers of our platform
> delivered solid results. Importantly, the momentum we see in our business today is
> strong.
>
> * * *
>
> My view of the RAIN market today is strong growth with enormous potential.
> Starting with that strong growth, recall on our last earnings call we guided our 2017
> Endpoint IC volumes to be between 7.8 billion and 8 billion units, 32% growth over
> 2016 at the midpoint. Roughly equivalent to one IC for every person on the planet.
>
> That prior guidance, which represents growth of nearly 2 billion units over 2016,
> remains unchanged.

95.     Defendant Fein also commented on the Company's purportedly strong performance

in the quarter and the Company's endpoint IC volume estimates, stating, in relevant part:

> Consistent with our plan, we continued increasing inventory levels to meet market
> demands, reduce lead times, and support our growth. We increased inventory by
> $11.5 million over the prior quarter, bringing the balance to $39.2 million.
>
> * * *
>
> [W]e are maintaining our 2017 Endpoint IC volume estimate between 7.8 billion
> and 8.0 billion units, representing 32% growth over 2016 at the midpoint and a
> 2010 to 2017 volume CAGR of 36%.

96.     During the call, Defendant Fein responded to a question by an analyst concerning

inventory and the Company's visibility into inventory.  The exchange was as follows:

> [Analyst]
>
> Got it. And then there's obviously been a lot of reports of retail store closures here
> recently. Evan, you made some nice comments earlier on the balance sheet and how
> you're thinking about inventory levels.
>
> How do you feel about inventory, and specifically your visibility of inventory, with
> your inlay providers? And maybe just talk about where you stand today on that?

* * *

[Defendant Fein]

Yes. [. . .] So as you know, we have an array of Endpoint IC customers that we keep in regular contact with. We have relationships at all levels of those customers, meaning both executive and kind of in the line and managerial level. And based on those checks, we feel very good about the inventory levels at those places.

97.     Defendant Fein also had the following exchange with an analyst concerning the

Company's rapidly building inventory:

[Analyst]

So I just had two quick ones from me. So first, on the inventory side, it looks like that's building pretty rapidly here. It looks like you're at $39 million for March, but then you are talking about potentially this being one of the best setups you've seen in years. So is this just essentially a backlog of demand building or why is the inventory up another $12 million or so?

* * *

[Defendant Fein]

2016 was a year where we were not able to adequately meet customer demand because our inventory position was too low.

And we are in the process of correcting for that so that we can have an inventory position that meets demands of our market, the timing needs of our customer, and so forth. And we're not quite there yet. The $39.2 million is a step in that direction.

But as I said, the momentum and the demands are so great, we're going to invest even more in inventory in the second quarter. And then that growth in inventory will slow a bit on an absolute basis that will continue to rise. But the expansion will moderate.

### *August 3, 2017 Press Release*

98.     On August 3, 2017, the Company issued a press release announcing its financial

results for its second fiscal quarter ended June 30, 2017.  The press release stated, in relevant part:

"We continue seeing strong indicators of growing adoption of RAIN and the Impinj platform across multiple verticals, including retail, healthcare and logistics," Diorio continued. "However, as we enter the third quarter we see schedule slips in planned

rollout expansions at several large end customers, and consequently, we are revising our 2017 full-year endpoint IC estimate to be between 7.0 billion to 7.2 billion units. We remain confident in our market opportunity and will continue investing to enhance our leading market position."

**Second Quarter 2017 Financial Summary**

- Revenue grew 31% year-over-year to $34.1 million
- GAAP gross margin of 53.3%; non-GAAP gross margin of 54.7%
- GAAP net loss of $1.0 million, or loss of $0.05 per basic and diluted share using 20.6 million shares
- Adjusted EBITDA of $1.4 million
- Non-GAAP net income of $1.3 million, or income of $0.06 per diluted share using 21.9 million shares

99.    As to the Company's guidance for the third quarter, the press release stated, in

relevant part:

The following table presents Impinj's financial outlook for the third quarter of 2017 (in millions, except per share data):

| | Three Months Ended September 30, 2017 |
|---|---|
| Revenue | $31.75 to $33.25 |
| GAAP Net income (loss) | $(5.55) to $(4.05) |
| Adjusted EBITDA | $(1.65) to $(0.15) |
| Non-GAAP net income (loss) | $(1.7) to $(0.2) |
| GAAP Weighted-average shares outstanding — basic and diluted | 20.8 to 21.3 |
| GAAP Net income (loss) per share — basic and diluted | $(0.27) to $(0.19) |
| Non-GAAP Weighted-average shares outstanding — basic and diluted | 20.8 to 21.3 |
| Non-GAAP Net income (loss) per share — basic and diluted | $(0.08) to $(0.01) |

*August 3, 2017 Earnings Call*

100.    On August 3, 2017, the Company also held an earnings call discussing its second

quarter results.  During the call, Defendant Diorio commented on the Company's reduced endpoint

IC guidance for the full year 2017, stating, in relevant part:

In 2016, we benefited from several large end customer rollouts that helped drive our endpoint IC volumes up approximately 70% over 2015. As we enter the third quarter, we see a different situation with several large end customers delayed planned expansions. I visited 2 of these customers overseas in the last 30 days. According to them, their deployment plans and goals remain unchanged, but their rollouts are delayed by internal schedule slips. Consequently, we are reducing our full year 2017 endpoint IC guidance from between 7.8 and 8.0 billion units to

between 7.0 and 7.2 billion units representing 18% growth over 2016 at the midpoint.

101.   During the call, Defendant Diorio had the following exchange with an analyst concerning the delay of rollouts:

[Analyst]

Any sense in terms of how long they view the delay? Is there some digestion period? Any visibility into when they would kind of ramp back up?

[Defendant Diorio]

Craig I think I'm just going to say a little bit about kind of those delays, maybe a little bit more right now, and then we'll touch on their ramp period as they ramp back up. So despite seeing significant wins in the second quarter in retail logistics and healthcare, in this coming third quarter, we're seeing coincident schedule slips in a few planned and funded end customer deployments. Our direct discussions with these end customers indicate the delays are due primarily . . . to internal process and integration challenges at their end. We don't see evidence that macro trends are common themes other than our difficulty predicting the timing of large rollouts, which we have talked about previously. So we see 2 impacts to our business. First, our endpoint [IC] business is impacted by scheduled foot slips at a few retail end customers. And then second, our fixed infrastructure business is impacted by scheduled slips in a few non-retail deployments. And the length of slips really varies by the end customer, and so it's difficult to predict how quickly they're going to overcome this integration challenges. Really, as we've noted before, timing whales is just difficult.

102.   Defendant Brodersen had the following exchange with an analyst regarding Impinj's future growth as it relates to customers' issues:

[Analyst]

So I think the biggest highlight here, and what people are trying to figure out is, you mentioned that you landed already whales and the contracts are signed. So if that's the case, does that mean we're going to see kind of material growth when we start out 2018? Or how does kind of the sequential trend work out given that the timing is very difficult for you guys to figure out?

* * *

[Defendant Brodersen]

[T]here's a couple of pieces here to your question. You're sort of probing on timing and the pace at which some of these programs come back online, correct? So I think as Chris highlighted it, the length of these schedule slips really is dependent on the customer. But I think, we're comfortable saying that it's generally measured in quarters. And so that's the way I think I would best describe the way that you think about modeling or the way that you think about when the business comes back online.

103.    During the call Defendant Diorio expressed to an analyst that there was no "macro trend" occurring when asked about which types of customers were facing issues.  The exchange was as follows:

[Analyst]

[I]t sounds like one or more of these may be existing customers that was in the process of expanding a deployment? Or maybe, are these entirely new customers?

[Defendant Diorio]

You are correct. Some are customers that were expanding existing deployment. Some of them, kind of visionary customers that were having expansions and they've just gone a little slower for internal reasons. And some may be new customers that had already planned deployments and they had schedules, and for internal reasons, again, they had schedule slips. And I think what we're just seeing here is that – the word I used previously was there's some coincident schedule slips. We don't see any macro trend in those – in the coincident nature of those schedule slips. It just happens to be that a couple of them happened at the same time. And as a consequence, we reduced our endpoint IC guidance.

104.    Defendant Diorio was also asked by another analyst about customers' schedule slips and the Company's communications with such customers:

[Analyst]

Just curious on the schedule slips you called out. It sounded like you were having direct discussion with the retailers. Did you get any indications from – or I guess, were these going through any of your direct partners, like the inlay partners that you typically work with[, with] your retail customers? Or was there reason you got more directly involved with these particular end users or end customers?

[Defendant Diorio]

First, the slips are not all isolated to the retail vertical. And so I noted, probably before you joined the call, that there's impacts on the retail side, as well as fixed infrastructure business in other verticals. So it's not all confined to retail, which is against the point that we don't see a macro trend. And then for us, we really use the best techniques available to us to get information, as well as to drive our business forward. So we engage closely with our partners and we also engage directly with the end customers helping our partners drive business into those end customers. And our engagements with those end customers not only allows us to really time the deployments and understand what the market's doing, but also gives us information on the nature of these slips and helps us drive business. So we remain confident in our long-term outlook vision as a consequence, and it's just the nature of how we're engaging in the market today that gives us this visibility to these slips, which again, for a customer that's a whale, they can pull in or push out kind of at their whim. And I guess, I don't want to use quite that word, but they do it based on what their internal schedules drive. And as I noted in my comments, a pull in or push out could actually mean several hundred million IC units to us.

***November 1, 2017 Press Release***

105.    On November 1, 2017, the Company issued a press release announcing its financial

results for its third fiscal quarter ended September 30, 2017.  The press release stated, in relevant

part:

> "We delivered a solid third quarter with strong reader and gateway volume growth," said Chris Diorio, Impinj co-founder and CEO. "Our 2017 endpoint IC unit guidance remains unchanged at between 7.0 and 7.2 billion units. We see indicators of growing adoption for RAIN, and the Impinj platform, however, we expect to see a slight decrease in endpoint IC volumes in the second half of the year. We remain confident in our market opportunity and will continue investing in and delivering solutions and enterprise partnerships that leverage our platform, accelerate adoption and drive scale in this gigantic market opportunity."
>
> **Third Quarter 2017 Financial Summary**
>
> - Revenue grew 5% year-over-year to $32.6 million
> - GAAP gross margin of 52.1%; non-GAAP gross margin of 53.7%
> - GAAP net loss of $4.9 million, or loss of $0.23 per basic and diluted share using 20.8 million shares
> - Adjusted EBITDA loss of $1.5 million
> - Non-GAAP net loss of $1.6 million, or loss of $0.08 per diluted share using 20.8 million shares

106.    As to the Company's guidance for the fourth quarter, the press release stated, in

relevant part:

The following table presents Impinj's financial outlook for the fourth quarter of
2017 (in millions, except per share data):

|  | Three Months Ended December 31, 2017 |
| --- | --- |
| Revenue | $28.25 to $29.75 |
| GAAP Net income (loss) | $(8.75) to $(7.25) |
| Adjusted EBITDA | $(4.85) to $(3.35) |
| Non-GAAP net income (loss) | $(4.95) to $(3.45) |
| GAAP Weighted-average shares outstanding — basic and diluted | 20.9 to 21.4 |
| GAAP Net income (loss) per share — basic and diluted | $(0.42) to $(0.34) |
| Non-GAAP Weighted-average shares outstanding — basic and diluted | 20.9 to 21.4 |
| Non-GAAP Net income (loss) per share — basic and diluted | $(0.24) to $(0.16) |

### *November 1, 2017 Earnings Call*

107.    On November 1, 2017, the Company held an earnings call discussing its third

quarter results.  During the call, Defendant Diorio touted "strong fourth quarter demand" despite

issues facing the Company, stating, in relevant part:

We also see strong fourth quarter demand. Our market data, sales volumes and, for
me personally, deep discussions with partners and end users reinforce my belief
that the second RAIN adoption wave is upon us. And even as we see that second
wave driving significant reader and gateway volume growth, we see a few
percentage points decline in second half 2017 endpoint IC unit volumes versus first
half. The reasons aren't completely clear to us, but we do not believe our market
share has changed materially.

Rather, we believe several factors may be in play, the delays at several large
retailers, our inlay partners adjusting to our transition from constrained supply and
long lead times mid-2016 to early 2017 to buffer stock and short lead times now . .
. . Over time, we expect our endpoint IC growth rates to return from this year's 18%
to more historical norms, albeit with continued volatility.

In the meantime, we are seeing a few percentage points larger endpoint IC price
erosion than we planned in the second half of 2017 due to stiffened competition in
a time of slower growth, causing a modest decline in second half 2017 endpoint IC
gross margins rather than the increases we saw in the past years. In light of these
new market dynamics, we are rebalancing inventory, ramping reader and gateway
production and slowing endpoint IC production.

108.    During the call, Defendant Fein commented on the Company's fourth quarter outlook, stating, in relevant part:

> [W]e will moderate endpoint IC production consistent with our plan to have 1 billion units of endpoint IC buffer at year-end, at the same time ramping reader and gateway production.

> As Chris also noted, our fourth quarter outlook is impacted by a decline in endpoint IC demand as well as by insufficient reader and gateway inventory, with the latter causing us to push meaningful revenue into 2018.

109.    Also during the call, Defendant Diorio engaged in the following exchange with an analyst, discussing the Company's decline year-over-year:

> [Analyst]

> [C]an you talk about just the decline year-over-year and why you don't think maybe it's a share loss of EBIT on a short-term basis? Just how do you think about your relative share given the softer second half of the year versus the first half when your retailers should be a little stronger on a seasonal basis?

> * * *

> [Defendant Diorio]

> As I said, we believe that there's a couple of factors in play. One is, again, the delay, with several large retailers not introducing those large step function increases. And number two is our inlay partners adjusting from a transition where we had constrained supply and long lead times to us having buffer stock and short lead times now.

> And another one is some seasonality in resale deployment timing, which our previously long lead times may have masked. And so we're actually seeing a bit of slowness in sort of those deployments in Q4, which previously we sort of drove right through because we had long lead times and significant pending orders. But now our inlay customers are ordering mainly at the time that they need [to] – or closer to the time that they need the product. And so we are seeing a little bit of seasonality in Q4, especially in terms of new deployments.

> * * *

> [W]e don't believe that our endpoint IC market share has changed materially.

> * * *

[Analyst]

Can you kind of walk us through . . . just kind of how you see the market developing over the course of '18 to think about 20% or greater endpoint growth next year?

[Defendant Diorio]

Sure. So we do see some volatility on a quarter-by-quarter basis, both due to timing and due to any particular opportunity ramping up. . . . [I]f you look back to last year, we were, essentially in allocation, we didn't have enough product. And . . . so we have long lead times, and we see a normalization happening now as we accommodate basically a new dynamic where we have sufficient product to meet the demand. And so what we see at least is sort of an underlying growth rate in the industry that's more along the lines of historical norms. And we expect our volumes to approach and get closer to those historical norms over time.

## **The Truth Begins to Emerge**

### *February 1, 2018 Press Release*

110.    On February 1, 2018, the Company issued a press release announcing preliminary revenue for its fiscal fourth quarter ended December 31, 2017 and a reduced outlook for the following quarter, in addition to announcing that Defendant Fein was resigning from his position as CFO.  The press release stated, in relevant part:

The company expects its fourth quarter 2017 revenue to be between $29.0 and $30.0 million, above its prior guidance of $28.25 to $29.75 million. The company will report detailed financial results on its February 15, 2018 conference call.

"We delivered fourth quarter revenue consistent with our prior guidance, including strong unit-volume growth in our fixed-reader business. Our prospects for continued growth in fixed-reader deployments remain strong," said Chris Diorio, Impinj co-founder and CEO.

"Turning to first quarter 2018, our shortened endpoint IC lead times have contributed to a reduction in our endpoint IC order backlog as well as ongoing reductions in inlay-partner inventory. Consequently, despite continued growth in endpoint IC consumption and in the number of deployments by end users, we currently anticipate softness in our endpoint IC volumes and first quarter revenue of $20 to $22 million," continued Diorio.

"We anticipate additional growth in our own inventory in first quarter 2018 to coincide with our endpoint IC volume softness. We remain confident that our inventory does not have material obsolescence risk. We also have adequate endpoint IC supply in a year of global semiconductor wafer tightness. Our cash position remains strong even as we balance short-term expenses with a reduced short-term revenue outlook," continued Diorio.

### *February 15, 2018 Press Release*

111.    On February 15, 2018, the Company issued a press release announcing its financial results for its fiscal fourth quarter and year ended December 31, 2017.  The press release stated, in relevant part:

"Our fourth quarter revenue included strong fixed-reader unit-volume growth of 42% year-over-year," said Chris Diorio, Impinjco-founder and CEO. "As we announced earlier this month, we anticipate softness in our first-quarter 2018 endpoint IC volumes and revenue due to shortened lead times contributing to a reduction in our order backlog, as well as ongoing reductions in inlay-partner inventory," Diorio continued. "We remain confident in our market opportunity, position, and in our vision of identifying, locating and authenticating every item in our everyday world, and connecting every one of those items to the cloud."

**Fourth Quarter 2017 Financial Summary**

- Revenue declined 20% year-over-year to $26.9 million
- GAAP gross margin of 48.4%; non-GAAP gross margin of 50.5%
- GAAP net loss of $9.3 million, or loss of $0.45 per basic and diluted share using 20.9 million shares
- Adjusted EBITDA loss of $5.8 million
- Non-GAAP net loss of $5.9 million, or loss of $0.28 per diluted share using 20.9 million shares

**Full Year 2017 Financial Summary**

- Revenue grew 12% year-over-year to $125.3 million
- GAAP gross margin of 51.8%; non-GAAP gross margin of 53.4%
- GAAP net loss of $17.3 million, or a loss of $0.84 per basic and diluted share using 20.7 million shares
- Adjusted EBITDA loss of $5.6 million
- Non-GAAP net loss of $6.1 million, or loss of $0.29 per diluted share using 20.7 million shares

112.     As to the Company's guidance for the first quarter, the press release stated, in

relevant part:

The following table presents Impinj's financial outlook for the first quarter of 2018
(in millions, except per share data):

| | Three Months Ended March 31, 2018 |
|---|---|
| Revenue | $23.25 to $25.25 |
| GAAP Net income (loss) | $(15.5) to $(14.0) |
| Adjusted EBITDA | $(7.5) to $(6.0) |
| Non-GAAP net income (loss) | $(8.9) to $(7.4) |
| GAAP Weighted-average shares outstanding — basic and diluted | 21.0 to 21.4 |
| GAAP Net income (loss) per share — basic and diluted | $(0.74) to $(0.65) |
| Non-GAAP Weighted-average shares outstanding — basic and diluted | 21.0 to 21.4 |
| Non-GAAP Net income (loss) per share — basic and diluted | $(0.42) to $(0.35) |

### *February 15, 2018 Earnings Call*

113.     On February 15, 2018, the Company held an earnings call discussing its fourth

quarter and full year 2017 financial results.  During the call, Defendant Diorio commented on the

Company's declining performance, stating, in relevant part:

Rather than provide annual endpoint IC guidance in 2018 as we have done in the
past, we will instead provide quarterly revenue results for endpoint ICs and for
systems, the latter comprising our platform's connectivity and software layers. We
believe this segmentation better aligns with how we view our business and how we
track the fixed reading adoption wave I have discussed on prior calls.

Starting with endpoint ICs. Our endpoint IC lead times have contracted from an
average of 10 to 12 weeks in 2016 to an average of 4 to 6 weeks today. As a
consequence, we have seen a significant reduction in our order backlog, and we
expect our inlay partners to further reduce their inventory by between 500 million
and 1 billion units, mostly in the first and second quarters. As a result, even though
we anticipate 15% to 20% growth in end user endpoint IC consumption in 2018,
our first half 2018 unit volume growth will lag end user consumption.

114.     Also during the call, Defendant Fein discussed why Impinj's results did not meet

the revised guidance that was just announced weeks earlier, stating, in relevant part:

Fourth quarter revenue was $26.9 million, compared with $33.7 million in the fourth quarter of 2016, below the preliminary estimates we announced in our February 1 pre-release. After that pre-release, we agreed to a partner's request for a onetime product exchange, requiring us to take an accounting reserve and decrease our 2017 revenue by $3.2 million. There is also a decrease to our cost of sales and an increase to our inventory. We expect to reverse this reserve in the first quarter of 2018 when we complete the exchange and recognize $3.2 million in revenue at that time. We increased our first quarter guidance by this $3.2 million reserve.

115.    During the call, Defendant Brodersen engaged in the following exchange with an

analyst regarding the Company's lead times:

[Analyst]

First of all, just can you help explain, if we're talking about a 6-week reduction in lead times, why do you think it's going to take 2 quarters to achieve this inventory depletion?

* * *

[Defendant Brodersen]

I think as you think through the inventory correction, a couple of things. Really, when you take a look at the history of our business over the last couple of quarters, as we guided and evidenced by our guide middle of last summer, we saw demand beginning to adjust downward and saw our backlog decline through the second half with really no corresponding customer inventory change. But as our lead times have normalized back down around that 4- to 6-week level, down from 10 to 12, inlay customers are adjusting their inventory to our new lead times. So to quantify that, if you look at 2017 volumes, we ship about 140 million units a week. So a 4- to 8-week lead time contraction equates to roughly 500 million to 1 billion units. And the confirmation on that is really linked to our detail bottoms-up work that we've been undergoing with our inlay customers over the last few weeks as we have been finalizing our annual negotiations, which also centers around a corresponding reduction right in that same range. So we feel like that, that's a very solid assessment of inventory drawdown.

116.    A different analyst further questioned Defendant Brodersen about Impinj's lead

times:

[Analyst]

Just a question following up on the lead times. If you can discuss kind of just some of the background there in terms of as they are stretched and then just things you might look to do to assess that on go-forward basis in terms of being able to perhaps maybe manage the lead times differently.

\* \* \*

[Defendant Brodersen]

I think the expansion in the market that we saw in '16, having inspired growth rates in that time period, really drove as we've highlighted before, a contraction in our ability to supply. And in certain cases, we had to extend our lead times, as we said, into that 10- to 12-week range. What we're at today in that 4 to 6 range is the normal baseline that we expect to run the business against.

117.    Defendant Brodersen was also pressed during the call by an analyst asking about when the Company came to understand the excess inventory with its partners during the quarter. The exchange was as follows:

[Analyst]

First, can you talk through the – just curious to get a sense of talking through the timing of when you came to understand the excess inventory at the inlay partners during the quarter. And I guess, curious if it came up kind of simultaneously or did you sort of discover them one at a time as you [were] going through different points in the quarter?

[Defendant Brodersen]

Brad, I think it's best to highlight that as part – the deepest understanding really is driven by the detailed work we're doing in our negotiations around annual supply agreements and pricing negotiations and continued work in measuring and managing and triangulating with our customers around their expected demand and their corresponding inventory position. So it's really been over the last, as I said, few weeks, quarter or so.

### *May 7, 2018 Press Release*

118.    On May 7, 2018, the Company issued a press release announcing its financial results for its fiscal first quarter ended March 31, 2018.   The press release stated, in relevant part:

"Based on team execution, enhanced partner inventory visibility and positive bookings trends," said Chris Diorio, Impinj co-founder and CEO, "we believe we are on track to make the first half of 2018 the turning point for our business."

**First Quarter 2018 Financial Summary**

- Revenue was $25.1 million
- GAAP gross margin of 46.9%; non-GAAP gross margin of 49.2%
- GAAP net loss of $14.4 million, or loss of $0.68 per basic and diluted share using 21.1 million shares
- Adjusted EBITDA loss of $7.1 million
- Non-GAAP net loss of $8.0 million, or loss of $0.38 per diluted share using 21.1 million shares, calculated using our historical methodology for non-GAAP net income; see "Non-GAAP Financial Measures" below for more information

119.    As to the Company's guidance for the second quarter, the press release stated, in relevant part:

The following table presents Impinj's financial outlook for the second quarter of 2018 (in millions, except per share data):

| | Three Months Ended June 30, 2018 |
|---|---|
| Revenue | $25.0 to $27.0 |
| GAAP Net loss (1) | $(12.1) to $(10.6) |
| Adjusted EBITDA | $(7.75) to $(6.25) |
| Non-GAAP Net loss | $(8.0) to $(6.5) |
| GAAP Weighted-average shares — basic and diluted | 21.3 to 21.6 |
| GAAP Net loss per share — basic and diluted (1) | $(0.57) to $(0.49) |
| Non-GAAP Weighted-average shares — basic and diluted | 21.3 to 21.6 |
| Non-GAAP Net loss per share — basic and diluted | $(0.38) to $(0.30) |

***May 8, 2018 Form 10-Q***

120.    On May 8, 2018, the Company filed its quarterly report on Form 10-Q with the SEC for its first fiscal quarter (the "1Q 2018 10-Q"), signed by Defendant Brodersen.  The 1Q 2018 10-Q reaffirmed financial results presented in the Company's May 7, 2018 press release.

121.    Attached to the 1Q 2018 10-Q were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 signed by Defendants Diorio and Brodersen attesting to the accuracy of the 1Q 2018 10-Q.

*July 2, 2018 Proxy Statement*

122.    On July 2, 2018, the Company filed the 2018 Proxy Statement.  Defendants Diorio,

Sessler, Alberg, Bybee, van Oppen, and Wise solicited the 2018 Proxy Statement filed pursuant to

Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

123.    The 2018 Proxy Statement stated, regarding the Company's Code of Conduct, that:

Our board of directors has adopted corporate governance guidelines. These
guidelines address, among other items, the responsibilities of our directors, the
structure and composition of our board of directors and corporate governance
policies and standards applicable to us in general. In addition, our board of directors
has adopted a code of business conduct and ethics that applies to all of our
employees, officers and directors, including our chief executive officer, chief
financial officer, and other executive and senior financial officers.

124.    The 2018 Proxy Statement was false and misleading because, despite assertions to

the contrary, its Code of Conduct was not followed, as the Individual Defendants allowed false

and misleading statements to be issued to the investing public.

125.    The Individual Defendants also caused the 2018 Proxy Statement to be false and

misleading with regard to executive compensation in that they purported to employ "performance

metrics" while failing to disclose that the Company's financial prospects were misrepresented as

a result of false and misleading statements, causing the Company's share price to be artificially

inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged

herein.

126.    Further, the 2018 Proxy Statement failed to disclose that: (1) the Company's

significant increase in customers in 2016 weakened the Company's ability to fulfill production

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

obligations to its customers, resulting in production lead times twice as high as Impinj's normal baseline lead times; (2) higher sales of endpoint ICs by Impinj were not indicative of increased product adoption propelling strong demand, and instead were the byproduct of customers buying more inventory to account for extended lead times; (3) Impinj was engaged in misconduct that led to an employee complaint and the commencement of an independent investigation by the Audit Committee; and (4) the Company failed to maintain internal controls.

### The Truth Fully Emerges

#### *August 2, 2018 Press Release*

127.    On August 2, 2018, Impinj issued a press release announcing that the Company would delay its earnings release, earnings call, and the filing of its quarterly report on Form 10-Q with the SEC for its second quarter ended June 30, 2018.  Moreover, the press release announced that the Company had received a complaint from a former employee, upon which the Audit Committee commenced an independent investigation.   The press release provided preliminary second quarter financial results, stating, in relevant part:

> SEATTLE, Aug.   02,   2018 (GLOBE   NEWSWIRE)   -- **Impinj, Inc.** (NASDAQ: PI), a leading provider and pioneer of RAIN RFID solutions for identifying, locating and authenticating everyday items, announced today that it anticipates reporting stronger-than-expected results for second quarter 2018. The Company also announced it will delay its second-quarter 2018 earnings release and investor conference call, as well as the filing of its Quarterly Report on Form 10-Q, for the quarter ended June 30, 2018.
>
> **Preliminary Results for Second Quarter 2018**
>
> Second-quarter revenue was $28.5 million, above the high end of the Company's guidance. "Endpoint IC sales exceeded expectations even as our inlay partners further reduced their inventory. We believe that our partners' endpoint IC inventory correction is now mostly resolved," said Impinj co-founder and CEO, Chris Diorio.

"Our systems business rebounded nicely from first quarter 2018 as reader IC supply improved and project-based deal timing turned more favorable," continued Diorio. "We saw continued strong reader IC demand and expect to meet that demand in the third quarter as our reader IC supply improves. Despite the more favorable deal timing, our APAC team reorganization continued to impact our systems business growth on a year-over-year basis as that team ramps productivity. Regardless, we remain confident in the quality and size of our opportunities and our pipeline is growing."

The Company reduced its overall inventory by $1.4M, led by an endpoint IC inventory reduction that exceeded expectations. Impinj continues to forecast further inventory reductions in the second half of 2018.

"In summary, we are pleased with the operational excellence the Impinj team delivered this quarter," continued Diorio. "We expect to outperform our guidance on revenue, EPS, adjusted EBITDA and inventory. Sequentially, on a non-GAAP basis, gross margins increased slightly and operating expenses decreased. Our backlog is growing, and we continue to believe the first half of 2018 was the turning point for our business. We would like to personally thank each and every Impinj employee for their focus and dedication to executing our vision of identifying, locating and authenticating every item in our everyday world."

All financial results in this press release were prepared by management and are preliminary. As noted below, the Audit Committee of Impinj's Board of Directors has commenced an independent investigation. Because the investigation is not yet completed and no conclusions with respect thereto have been reached, Impinj is currently unable to determine whether any changes will be required with respect to its reported results of operations for the three and six months ended June 30, 2018 or any other period, as well as any impact on the Company's internal control over financial reporting.

128.     As to the Audit Committee Investigation, the press release stated, in relevant part:

The Audit Committee of Impinj's Board of Directors has commenced an independent investigation in connection with a complaint filed by a former employee. The Audit Committee has retained independent counsel to assist it in its investigation. Impinj has contacted the Securities and Exchange Commission ("SEC") to advise it that an independent investigation is underway, and the Audit Committee intends to provide additional information to the SEC as appropriate as the investigation proceeds. Impinj cannot predict the duration or outcome of the investigation, and will not be in a position to file Form 10-Q until the Audit Committee completes its investigation.

129.    On this news, the price per share of Impinj common stock fell $3.02 per share, or 13.7%, from the previous day's trading price, closing at $18.97 per share on August 3, 2018.

130.    The statements referenced in ¶¶ 81-86 and 92-121 above were materially false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements that failed to disclose material adverse facts about Impinj's business, operations and compliance policies. Specifically, those statements failed to disclose that: (1) the Company's significant increase in customers in 2016 weakened the Company's ability to fulfill production obligations to its customers, resulting in production lead times twice as high as Impinj's normal baseline lead times; (2) higher sales of endpoint ICs by Impinj were not indicative of increased product adoption propelling strong demand, and instead were the byproduct of customers buying more inventory to account for extended lead times; (3) Impinj was engaged in misconduct that led to an employee complaint and the commencement of an independent investigation by the Audit Committee; and (4) the Company failed to maintain internal controls. As a result of the foregoing, Impinj's public statements were materially false and misleading at all relevant times.

131.    In breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused or permitted the Company to make the false and misleading statements and omissions of material fact to the investing public as set forth above.

132.    Moreover, the Individual Defendants breached their fiduciary duties by willfully or recklessly failing to correct and causing the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein.

133.    In further breach of their fiduciary duties, the Individual Defendants willfully or recklessly failed to maintain internal controls.

## **DAMAGES TO IMPINJ**

134.    As a direct and proximate result of the Individual Defendants' conduct, Impinj has lost and will continue to lose and expend many millions of dollars.

135.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Actions filed against the Company, its CEO, its Chief Operating Officer, and its former CFO, and any internal investigations, including the Audit Committee's independent investigation, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136.    As a direct and proximate result of the Individual Defendants' conduct, Impinj has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

137.    Plaintiff brings this action derivatively and for the benefit of Impinj to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Impinj, unjust enrichment, violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

138.    Impinj is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

139.    Plaintiff is, and has been at all relevant times, a shareholder of Impinj. Plaintiff will adequately and fairly represent the interests of Impinj in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

140. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

141. A pre-suit demand on the Board of Impinj is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Diorio, Alberg, Bybee, Sessler, van Oppen, and Wise (the "Director-Defendants"), and non-party Daniel Gibson (collectively, with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

142. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while four of the Individual Defendants engaged in insider sales, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

143. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

144.    The Director-Defendants knew of the falsity of the misleading statements at the time they were made. The production and sale of the Company's endpoint ICs goes to the core operations of Impinj. The platform offered by the Company cannot exist without its endpoint ICs.

145.    As Board members of Impinj, charged with overseeing the Company's affairs, Director-Defendants Diorio, Alberg, Bybee, Sessler, van Oppen, and Wise all must have had knowledge of information pertaining to the Company's core operations and the material events giving rise to these claims. Specifically, as Board members of Impinj, Defendants Diorio, Alberg, Bybee, Sessler, van Oppen, and Wise must have been aware of the material facts surrounding the sales and production of the Company's essential physical product.

146.    Therefore, Director-Defendants Diorio, Alberg, Bybee, Sessler, van Oppen, and Wise each knew of the falsity of the statements and misleading omissions detailed herein at the time such statements were made, and further failed to exercise or recklessly disregarded their duty of oversight to stop or correct such misleading statements and omissions.

147.    Additional reasons that demand on Defendant Diorio is futile follow. Defendant Diorio has served as the Company's CEO since November 2014 and as Vice Chair of the Board since September 2013.  He has served as a Company director since April 2000 and previously served as the Company's Chief Strategy and Technology Officer from September 2013 to November 2014.  He is also a co-founder of the Company.  He is thus a non-independent director. He receives handsome compensation, including $2,164,308 in the fiscal year ended December 31, 2017.  His insider sale before the fraud was exposed, which yielded over $2.1 million in proceeds, demonstrates his motive in facilitating and participating in the fraud.  As the Company's highest officer he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over

reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Diorio was responsible for all of the false and misleading statements that were made, including most of which he signed or personally made statements in. Furthermore, Defendant Diorio is a defendant in the Securities Class Actions. For these reasons, too, Defendant Diorio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

148.     Additional reasons that demand on Defendant Alberg is futile follow. Defendant Alberg has served as a Company director since September 2000, and serves as a member of the Audit Committee and the Nominating and Corporate Governance Committee. He receives handsome compensation, including $129,150 in the fiscal year ended December 31, 2017. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.  For these reasons, too, Defendant Alberg breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

149.     Additional reasons that demand on Defendant Bybee is futile follow. Defendant Bybee has served as a Company director since January 2008, and serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. He receives handsome compensation, including $139,150 in the fiscal year ended December 31, 2017. As a trusted Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls

over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Bybee breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

150. Additional reasons that demand on Defendant Sessler is futile follow. Defendant Sessler has served as a Company director since April 2011 and serves as Chair of the Audit Committee. He receives handsome compensation, including $162,653 in the fiscal year ended December 31, 2017. As a trusted Company director and Chair of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, too, Defendant Sessler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

151. Additional reasons that demand on Defendant van Oppen is futile follow. Defendant van Oppen has served as a Company director since January 2013 and serves as the Board's Chair. He also serves as a member of the Nominating and Corporate Governance Committee. He receives handsome compensation, including $162,653 in the fiscal year ended December 31, 2017. His insider sales before the fraud was exposed, which yielded over $2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. As a trusted Company director and Chair of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously

49

disregarded his duties to protect corporate assets.  For these reasons, too, Defendant van Oppen breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

152.    Additional reasons that demand on Defendant Wise is futile follow. Defendant Wise has served as a Company director since May 2016 and serves as a member of the Compensation Committee.  She receives handsome compensation, including $124,150 in the fiscal year ended December 31, 2017.  As a trusted Company director, she conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.  For these reasons, too, Defendant Wise breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

153.    Additional reasons that demand on the Board is futile follow.

154.    All of the Director- Defendants benefitted directly from the wrongdoing alleged herein, as the false and misleading statements caused the Company's stock price to be artificially inflated, thus increasing the value of Impinj stock and stock options held by the Director-Defendants.

155.    The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Directors would be futile.

156.    All of the Director-Defendants breached the duty of candor by making, or causing the Company to make, false and misleading statements regarding the Company's business, operations, and prospects, despite having knowledge of the falsity of those statements. The Director-Defendants may not be indemnified for breaching the duty of candor. As a result, all of the Director-Defendants face a substantial likelihood of liability and cannot evaluate a demand with disinterest. Therefore, demand is futile, and thus, excused.

157.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's issuance of materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of Section 14(a) of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records and reports, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

158.    Defendants Sessler, Alberg, and Bybee (the "Audit Committee Defendants") serve on the Company's Audit Committee. Pursuant to the Audit Committee Charter, Audit Committee Defendants were responsible for overseeing, *inter alia*, Impinj's accounting and financial reporting processes and internal control over financial reporting, the audit and integrity of the Company's financial statements, and the Company's compliance with applicable law. As a result of the Audit Committee's failures of management and oversight, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

159.    Impinj has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Impinj any part of the damages Impinj suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

160.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

161.    The acts complained of herein constitute violations of fiduciary duties owed by Impinj's officers and directors, and these acts are incapable of ratification.

162.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Impinj. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Impinj, there would be no

directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

163.    If there is no directors' and officers' liability insurance, then the Directors will not cause Impinj to sue the Individual Defendants named herein, as, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

164.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

165.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

166.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

167.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate

commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

168.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

169.    Under the direction and watch of the Directors, the 2017 and 2018 Proxy Statements failed to disclose that: (1) the Company's significant increase in customers in 2016 weakened the Company's ability to fulfill production obligations to its customers, resulting in production lead times twice as high as Impinj's normal baseline lead times; (2) higher sales of endpoint ICs by Impinj were not indicative of increased product adoption propelling strong demand, and instead were the byproduct of customers buying more inventory to account for extended lead times; (3) Impinj was engaged in misconduct that led to an employee complaint and the commencement of an independent investigation by the Audit Committee; and (4) the Company failed to maintain internal controls.

170.    The 2017 and 2018 Proxy Statements stated, regarding the Company's Code of Conduct, that:

> Our board of directors has adopted corporate governance guidelines. These guidelines address, among other items, the responsibilities of our directors, the structure and composition of our board of directors and corporate governance policies and standards applicable to us in general. In addition, our board of directors

has adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including our chief executive officer, chief financial officer, and other executive and senior financial officers.

171.    The 2017 and 2018 Proxy Statements were false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as the Individual Defendants allowed false and misleading statements to be issued to the investing public.

172.    The Individual Defendants also caused the 2017 and 2018 Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "performance metrics" while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

173.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2017 and 2018 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 and 2018 Proxy Statements, including but not limited to, election of directors and ratification of an independent auditor.

174.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 and 2018 Proxy Statements.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

175.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

176.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Impinj's business and affairs.

177.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

178.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Impinj.

179.    In breach of their fiduciary duties owed to Impinj, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose that: (1) the Company's significant increase in customers in 2016 weakened the Company's ability to fulfill production obligations to its customers, resulting in production lead times twice as high as Impinj's normal baseline lead times; (2) higher sales of endpoint ICs by Impinj were not indicative of increased product adoption propelling strong demand, and instead were the byproduct of customers buying more inventory to account for extended lead times; (3) Impinj was engaged in misconduct that led to an employee complaint and the commencement of an independent investigation by the Audit Committee; and (4) the Company failed to maintain internal controls.  As a result of the foregoing, Impinj's public statements were materially false and misleading at all relevant times.

180.    The Individual Defendants also failed to correct and/or caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

181.   Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

182.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Impinj's securities, and disguising insider transactions.

183.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Impinj's securities, and engaging in insider transactions. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

184.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Impinj has sustained and continues to sustain significant damages.

186. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

187. Plaintiff on behalf of Impinj has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

188. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Impinj.

190. The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from Impinj that was tied to the performance or artificially inflated valuation of Impinj, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or received excessive compensation.

191. Plaintiff, as a shareholder and a representative of Impinj, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

192. Plaintiff on behalf of Impinj has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)      Declaring that Plaintiff may maintain this action on behalf of Impinj, and that Plaintiff is an adequate representative of the Company;

(b)      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Impinj;

(c)      Determining and awarding to Impinj the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)      Directing Impinj and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Impinj and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Impinj to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Impinj restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.


Dated: October 26, 2018                          Respectfully submitted,

Of Counsel:                                      **FARNAN LLP**

**THE BROWN LAW FIRM, P.C.**                     /s/ Michael J. Farnan
Timothy W. Brown                                 Brian E. Farnan (Bar No. 4089)
240 Townsend Square                              Michael J. Farnan (Bar No. 5165)
Oyster Bay, NY 11771                             919 N. Market St., 12th Floor
Telephone: (516) 922-5427                        Wilmington, DE 19801
Facsimile: (516) 344-6204                        Telephone: (302) 777-0300
Email: tbrown@thebrownlawfirm.net                Facsimile: (302) 777-0301
                                                 Email: bfarnan@farnanlaw.com
                                                 Email: mfarnan@farnanlaw.com


                                                 *Attorneys for Plaintiff*