# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE IMPINJ, INC. DERIVATIVE LITIGATION, | ) <br> ) Civ. No. 18-1686-RGA <br> ) <br> ) |

## MEMORANDUM OPINION

Brian E. Farnan and Michael J. Farnan, FARNAN LLP, Wilmington, DE; Phillip Kim, THE ROSEN LAW FIRM, P.A., New York, NY; Timothy Brown, THE BROWN LAW FIRM, P.C., Oyster Bay, NY; Marion C. Passmore and Melissa A. Fortunato, BRAGAR EAGEL & SQUIRE, P.C., New York, NY. *Counsel for Plaintiffs*.

Lori W. Will and Nora M. Crawford, WILSON SONSINI GOODRICH & ROSATI, P.C.. Wilmington, DE; Gregory L. Watts, WILSON SONSINI GOODRICH & ROSATI, P.C, Seattle, Washington. *Counsel for Defendants*.

November 22, 2021
Wilmington, DE



**ANDREWS, U.S. DISTRICT JUDGE:**

This is a consolidated shareholder derivative action in which Plaintiffs primarily alleged that the Individual Defendants, who are officers and directors of Impinj, Inc. ("Impinj" or the "Company"), breached their fiduciary duties by allowing the Company to issue false and misleading statements in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiffs also asserted claims for unjust enrichment based on alleged insider trading. The Individual Defendants are Chris Diorio, Eric Brodersen, Evan Fein, Gregory Sessler, Tom A. Alberg, Clinton Bybee, Peter van Oppen, and Theresa Wise. Impinj is named as a Nominal Defendant. After very little litigation, the parties have agreed to a settlement. Pending before the Court is Plaintiffs' motion for final approval of the settlement and Plaintiffs' request for attorneys' fees and service awards. (D.I. 33). For the following reasons, the Court will approve the settlement, and award $439,745.12 in attorneys' fees and expenses and $1,500 in service awards.

## I.   BACKGROUND

### A.   The Claims

Impinj provides a platform comprising of integrated circuit tags ("ICs") and software that delivers item data to business applications. (D.I. 1 ¶¶ 2,3). Plaintiffs alleged that the Defendants willfully or recklessly failed to maintain internal controls at the Company and misrepresented and/or caused the Company to misrepresent Impinj's business, operations, and prospects in press releases, earnings calls, and filings with the SEC. (D.I. 13-1 § I, A). Specifically, Plaintiffs alleged that between November 3, 2016 and August 2, 2018 the Defendants caused Impinj to falsely tout in its public filings strong demand for its endpoint ICs, which artificially inflated the value of the Company's stock. (D.I. 1 ¶¶ 4, 81-126). Plaintiffs further alleged that certain Defendants unjustly enriched themselves by selling Company stock while knowing that its price was artificially inflated. (*Id.* at ¶¶ 90, 188-191). Finally, in August 2018, the Company revealed that its earnings

1

release would be delayed and that it received a complaint from a former employee that prompted an Audit Committee investigation. (*Id.* at ¶¶ 5-7).

### B. The Litigation

Plaintiffs Fotouhi and Weiss filed their individual complaints on October 26, 2018 and October 28, 2018, respectively. (D.I. 13-1 § I, B). Plaintiffs de la Fuente and Sanchez filed their complaint on November 8, 2018.[1] (*Id.*). On January 2, 2019, the Court granted the Parties' joint stipulation to consolidate the three actions and establish a leadership structure. (D.I. 7; D.I. 8).

On January 25, 2019, the Parties filed a joint stipulation to stay the Derivative Action in deference to the related securities class action, *In re Impinj, Inc. Securities Litigation*, Case No. 3:18-cv-05704, pending in the U.S. District Court for the Western District of Washington (the "Securities Class Action"). The Court granted the stay on January 28, 2019. (D.I. 10).

### C. The Settlement

On May 19, 2020, Plaintiffs sent Defendants a settlement proposal that included thirteen categories of corporate governance reforms and a demand for $10 million to be paid to the Company. (D.I. 34 at 5). Plaintiffs described their proposal as "essentially a wish list of every conceivable form of relief that might get whittled down through negotiation." (*Id.* at 5). Plaintiffs crafted the settlement proposal by relying entirely on public information. (Tr. 7:20-8:4).[2] On May 27, 2020, Defendants responded with a counterproposal. (D.I. 13-1 at 3). On May 28, 2020, the Parties participated in a mediation facilitated by a qualified and independent mediator. (*Id.*). Negotiations continued until June 5, 2020 when the parties agreed to settle the action for certain corporate governance reforms. (*Id.*; D.I. 34 at 10).

---

[1]  Because no consolidated complaint was filed, the Court relies on the individual complaint in the consolidated action, C.A. No. 18-1686 as representative (hereinafter, the "Complaint").

[2]  Cites to "Tr." refer to the transcript from the oral argument on Plaintiffs' Motion for Final Approval of the Settlement held on May 11, 2021.

To resolve the outstanding demand for a monetary contribution, on June 6, 2020, Defendants produced copies of the Audit Committee's presentation to the SEC regarding its investigation; the SEC's letter terminating its investigation without an enforcement recommendation; and the letter from the former employee withdrawing his OSHA complaint with prejudice. (D.I. 34 at 10). After reviewing these documents, which "revealed a material weakness in the case," Plaintiffs dropped their demand for a monetary contribution. (*Id*. at 11).

On June 8, 2020, the Parties agreed to a double-blind Mediator's proposal on the amount of attorneys' fees and reimbursement of expenses to be paid to Plaintiffs' Counsel. (D.I. 35 ¶ 38). On June 10, 2020, after the parties had agreed to the settlement terms and the fee request, Defendants produced to Plaintiffs 902 pages of confirmatory discovery primarily consisting of board meeting minutes, committee meeting minutes, and financial records relevant to the allegations in the Complaint. (*Id*. at ¶ 39; D.I. 31 at 6). On July 11, 2020, the Parties filed a Joint Motion for Preliminary Approval of the Derivative Settlement, which the Court granted on February 26, 2021 after requesting and receiving supplemental submissions. (D.I. 13; D.I. 14; D.I. 23; D.I. 25; D.I. 26).

## II.    DISCUSSION

The first issue before the Court is whether to approve the settlement. If the settlement is approved, then the Court must determine whether to award attorneys' fees and, if so, how much. Finally, the Court will address Plaintiffs' request for service awards.

### A.  Approval of the Settlement

Pursuant to Federal Rule of Civil Procedure 23.1, a court's approval is required to settle a derivative action. To grant approval, a court must find that the settlement is "fair, adequate, reasonable and proper, and in the best interests of the class and the shareholders." *Bell Atl. Corp. v. Bolger*, 2 F.3d 1310, 1317 (3d Cir. 1993). In making this determination, the Court must consider

the *Girsh* factors, which are: (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the shareholders to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement agreement in light of the best possible recovery; and (9) the range of reasonableness of the settlement agreement to a possible recovery in light of all the attendant risks of litigation. *See Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir.1975); *Shlensky v. Dorsey*, 574 F.2d 131, 148 (3d Cir. 1978) (stating that the *Girsh* factors apply to a shareholder derivative action). "The proponents of a settlement bear the burden of proving that these factors weigh in favor of approval." *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 (3d Cir. 2001). The Court has "wide discretion" in determining whether to grant or deny approval of a settlement. *Shlensky*, 574 F.2d at 147. Each *Girsh* factor is addressed in turn below.

### 1. First Factor: Complexity, Expense and Likely Duration of Litigation.

The first factor considers the "probable costs, in both time and money of continued litigation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814 (3d Cir. 1995). Shareholder derivative actions are, by their nature, "undeniably complex." *Unite Nat. Retirement Fund v. Watts*, 2005 WL 2877899 at *3 (D.N.J. Oct. 28, 2005). They can also be expensive. Defense counsel estimates that briefing and arguing a motion to dismiss could cost up to $500,000 dollars. (Tr. 5:17-23). This seems like a bargain compared to the $900,000 fee request by Plaintiffs' Counsel, but only if the motion to dismiss is guaranteed to end the case. The cost of litigating this case past a motion to dismiss, which would require the parties to engage in the formal discovery they have so far avoided, could quickly dwarf the cost of the fee request, particularly because this case involves multiple individual Defendants and claims based on a lack of oversight. For the foregoing reasons, this factor favors settlement.

## 2.   Second Factor: Reaction of Shareholders.

As a general rule, a small number of objectors weighs in favor of approval. *In re Johnson & Johnson Derivative Litig.*, 900 F. Supp. 2d 467, 482 (D.N.J. 2012).   But in the context of complex derivative actions, courts should be cautious before placing great weight on this factor, because the typical investor may not possess the tools with which to value settlement relief comprised entirely of corporate governance reforms. *Id.*   Here, no objections to the settlement have been made by any Impinj stockholders.   Accordingly, this factor weighs in favor of the settlement but perhaps not strongly.

## 3.   Third Factor: Stage of Proceedings & Amount of Discovery Completed.

This factor considers "the degree of case development" achieved before settlement negotiations to determine "whether class counsel had an adequate appreciation of the merits of the case" before reaching an agreement. *GM Trucks*, 55 F.3d at 813.   "Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties." *In re Johnson*, 900 F. Supp. 2d at 482.

This action has settled at the earliest possible stage.   The only activity on the docket before the parties sought approval of the settlement is the filing of the individual complaints, consolidation, and entry of a stipulated stay. (D.I. 8; D.I. 10; D.I. 13).   Plaintiffs' Counsel did not file a books and record demand pursuant to 8 *Del. C.* § 220 and no discovery took place before the parties agreed to the settlement terms. (Tr. 7:20-8:4, 23:4-14).   Plaintiffs' Counsel did engage in confirmatory discovery, but this practice has been criticized.

"'Confirmatory' discovery is discovery taken after an agreement-in-principle to settle a case has been reached." *In re Trulia, Inc. S'holder Litig.*, 129 A.3d 884, 893 n. 24 (Del. Ch. 2016). "Theoretically, it is an opportunity for plaintiffs' counsel to 'confirm' that the settlement terms are

reasonable—that is, to probe further the strengths and weaknesses of the claims relative to the consideration for the proposed settlement." *Id.* "In reality, given that plaintiffs' counsel already have resigned themselves to settle on certain terms, confirmatory discovery rarely leads to a renunciation of the proposed settlement and, instead, engenders activity more reflective of 'going through the motions.'" *Id.*

Accordingly, the information on which Plaintiffs' Counsel relied to negotiate the settlement terms does not reflect best practices. At the same time, however, there is no evidence of collusion. The parties relied on an experienced mediator as part of the settlement negotiations. *See* D.I. 35-2 (declaration of mediator). The settlement represented substantial concessions by both parties. (*See* D.I. 35-2 ¶¶ 12-13; D.I. 34 at 5-10). And the fee agreement was negotiated separately after the parties reached agreement on the reforms. (D.I. 35-2 ¶ 14). Thus, this factor favors approval of the settlement.

### 4. Fourth and Fifth Factors: Risks of Establishing Liability and Damages.

The fourth and fifth factors examine the potential risks and rewards of litigating the action "rather than settling it at the current time." *GM Trucks*, 55 F.3d at 814-16; *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004). These factors weigh strongly in favor of approval when a plaintiff faces "significant obstacles" in establishing liability. *In re Cendant*, 264 F.3d at 237-38.

Here, Plaintiffs faced numerous obstacles in establishing liability and damages. There is a real risk that the derivative action would not have survived a motion to dismiss pursuant to Rule 23.1, which imposes a heightened pleading standard. *See* Fed. R. Civ. P. 23.1 (stating that plaintiffs must plead demand futility "with particularity").

To overcome Rule 23.1, Plaintiffs needed to establish that a majority of the directors on the Board were not sufficiently disinterested to consider a demand. *Malone v. Brincat*, 722 A.2d

5, 14 (Del. 1998). Here, all the members of the Board except one were independent non-management directors. Thus, Plaintiffs alleged that the majority of the board was interested, for demand futility purposes, because the directors faced a substantial likelihood of liability. (D.I. 34 at 19). The claims, however, largely center on alleged failures to conduct proper oversight, the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment. *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

The material weaknesses in Plaintiffs' case is further demonstrated by the termination of the SEC investigation, the whistleblower's withdrawal of his complaint, and the Audit Committee's investigations conducted with the assistance of independent outside legal counsel, forensic experts, and outside auditors that found no wrongdoing. (D.I. 34 at 20; D.I. 31 at 5). Accordingly, this factor favors settlement.

**5. Sixth Factor: Risk of Maintaining the Class Action Through Trial.**

The sixth factor considers the risk of maintaining class status, because "the value of a class action depends largely on the certification of the class. *GM Trucks*, 55 F.3d at 817. "A derivative action does not present the same concern." *Unite Nat.*, 2005 WL 2877899, at *4. Therefore, this factor does not weigh for or against approval.

**6. Seventh Factor: Defendants' Ability to Withstand a Greater Judgment.**

Here, the settlement is based on corporate governance reforms and does not include a monetary component. (D.I. 13-1). But Plaintiffs' Complaint did seek damages. (*See* D.I. 1 Prayer for Relief). In addition, Plaintiffs initially sought a monetary contribution to the settlement. (D.I. 34 at 5). Because a monetary judgment could have been imposed on the Defendants after a successful trial, this factor is not, as Plaintiffs claim, inapplicable to the Court's analysis.

The analysis of this factor is complicated by the fact that the Individual Defendants are entitled to indemnification from the Company. (*See* Tr. 41:15-20; *see also* 8 *Del. C.* § 145). Thus,

Defendants may be able to withstand a greater judgment because they are not playing with their own money. At the same time, however, the Company has exhausted all of its available insurance. (Tr. 40:13-41:20). And Defendants made a representation in the related Securities Class Action that "Impinj is not and rarely has been profitable in its history." (*See* Securities Class Action, D.I. 97 at 7-8). So if this derivative action continues, then the Company that is supposed to benefit will be spending its own money in providing discovery, indemnifying the Individual Defendants, and funding their own obligations as a Nominal Defendant. (Tr. 41:15-20). Accordingly, this factor favors settlement.

### 7.   Eighth and Ninth Factors: Settlement's Range of Reasonableness in Light of the Best Possible Recovery and Litigation Risks

The last two factors evaluate whether the settlement represents a "good value for a weak case or a poor value for a strong case." *In re Warfarin*, 391 F.3d at 538. As described above, Plaintiffs have real weaknesses in their case. In addition, Plaintiffs estimated that any potential monetary recovery was "relatively small," no more than $ 9.3 million. (D.I. 34 at 21-22). At the same time, shareholder litigation commonly obtains only a few percent of total damages. *See In re AT&T Corp.*, 455 F.3d 160, 170 (3d Cir. 2006) (finding that a settlement representing only 4% of the total damages claimed was an "excellent" result). Accordingly, these two factors weigh in favor of approving the settlement.

### 8.   Weighing all of the *Girsh* Factors Together

A few of the *Girsh* factors are neutral while the vast majority of the *Girsh* factors favor approval of the settlement. No *Girsh* factor weighs against the settlement. Weighing all of the *Girsh* factors together, the Court finds that the proposed settlement is fair, reasonable, and adequate. Thus, the settlement is approved. I now turn to the matter of attorneys' fees.

## B. Attorneys' Fees

Plaintiffs request $900,000 in fees and expenses. (D.I. 34 at 25). The number was a double-blind proposal of an experienced Mediator, which both sides accepted.

An attorneys' fees award is governed by state rules when subject matter jurisdiction is based on diversity.[3] *Mor ex rel AmerisourceBergen Corp. v. Collis*, 654 F. App'x 553, 558 (3d Cir. 2016). Here, jurisdiction is not based on diversity, so federal rules will govern. (*See* D.I. 1 ¶¶ 15-17). Under the American rule applied in federal courts, a prevailing party is not entitled to recover attorneys' fees absent statutory authority or common law doctrine. *Shlensky*, 574 F.2d at 149. Accordingly, a request for attorneys' fees involves a two-step inquiry: (1) a determination as to whether plaintiffs' counsel is entitled to recover attorneys' fees, and (2) if yes, calculating the amount of attorneys' fees to award based on the appropriate method.

### 1. The Substantial Benefit Doctrine

Under federal common law, plaintiffs' counsel in a derivative action may recover their expenses, including attorneys' fees, if the corporation on whose behalf their action is taken receives a substantial benefit from their successful prosecution or settlement of the case. *Mills v. Electr. Auto-Lite Co.*, 396 U.S. 375, 395 (1970); *Shlensky*, 574 F.2d at 149. The benefit may be monetary or nonmonetary. *Shlensky*, 574 F.2d at 149.

Plaintiffs' counsel contends that the settlement substantially benefits Impinj by requiring it to implement corporate governance reforms that are specifically designed to prevent the recurrence of Defendants' alleged misconduct. (D.I. 34 at 26). The Settlement Agreement groups the reforms into ten sections. Each section is discussed in turn below.

---

[3]     This rule is based on a principle announced by the US Supreme Court that defendants should not be able to avoid unfavorable state law with respect to attorneys' fees by removing the case to federal court. *Montgomery Ward & Co. v. Pac. Indem. Co.*, 557 F.2d 51, 56 (3d Cir. 1977) (*discussing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975)).

- Adoption of Risk-Management Related Amendments to the Audit Committee Charter. As part of the settlement, the Audit Committee will be renamed the Audit and Risk Committee and its Charter will be amended to require specific risk-management responsibilities such as receiving from executive officers' quarterly reports on the Company's risk management activities, providing written reports to the Board of any material risks along with specific recommendations for mitigating those risks, providing annual reports to the Compensation Committee regarding the executive officers contribution to a culture of compliance, and conducting an annual review of the effectiveness of the Company's risk management policies and practices. (D.I. 13-1 § 1).

These reforms are intended to address allegations in the Complaint that the Board failed to conduct proper oversight which led to the allegedly false and misleading disclosures. (D.I. 31 at 11). Before the settlement, the Audit Committee Charter but did not contain the specific responsibilities identified. But the Charter did identify "risk management" as part of the Committee's oversight responsibilities and the Committee did generally perform the specific responsibilities identified, although it was not necessarily the Committee's practice to do so every quarter or to do so in writing. (D.I. 31 at 7 nn. 3, 4). Thus, the Court finds these reforms to be modest and incremental.

- Amendments to the Audit & Risk Committee Charter. The settlement amends the Audit & Risk Committee Charter to (i) require the committee to review the Company's Code of Conduct annually, (ii) solicit the input of department representatives as necessary to review the accuracy of the Company's public disclosures related to issues within their expertise, (iii) obtain an annual report listing all trades in Impinj securities made by the Company's executive officers, and (iv) conduct preemptive due diligence on potential independent auditors to ensure the Company is not without registered independent auditors upon the resignation or termination of its current auditors. (D.I. 13-1 § 5).

The first two reforms in this section are intended, like the reforms in the section above, to address allegations in the Complaint that the Board failed to conduct proper oversight. (D.I. 31 at 11). The third reform is intended to deter insider trading, another harm alleged in the Complaint. The fourth reform appears to be makeweight, because there were no allegations in the Complaint regarding the Company's auditor. Accordingly, the Court will disregard the fourth reform. The

remaining three reforms directly address the harms alleged in the Complaint and provide a
meaningful benefit. Before the settlement, the Audit Committee was not required to review the
Company's Code of Conduct on an annual basis and did not obtain a report of executive
management's trades in Impinj securities on an annual basis. (D.I. 31 at 9).

- Expert Advice on Internal Controls and Compliance Functions. As part of the
  settlement, the Company has agreed to retain an independent consulting service to
  assist it in identifying the appropriate steps it should take to test and strengthen the
  Company's internal controls. (D.I. 13-1 § 3).

This reform is intended to address allegations in the Complaint that the Company lacked
internal controls. Regardless, I have questions about the value of this reform. Defendants state
that before the settlement but after Plaintiffs filed their lawsuit, the Company engaged a consultant
to review the Company's internal controls for compliance with the Sarbanes-Oxley Act. (D.I. 31
at 8). If this prior engagement is considered by the parties to satisfy the terms of the Settlement
Agreement, then this reform has no value because "[p]ast consideration … cannot form the basis
for a binding contract." *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1232 (Del. Ch.
2000). If this prior engagement does not satisfy the terms of the Settlement Agreement, then this
reform could be nothing more than the Company spending money on a second independent
consultant that will likely duplicate the work performed by the previous consultant. Both Plaintiffs
and its Expert discussed this reform in vague generic terms without explaining how it is new,
different, and better for this Company specifically. (*See* D.I. 34 at 17; D.I. 35-1 ¶¶ 37-38).
Accordingly, I cannot determine that this reform has any value, and therefore I consider that it has
no value.

- Establishment of a Chief Compliance Officer. The settlement requires the Company
  to create a Chief Compliance Officer. It also expressly sets forth the responsibilities of
  the Chief Compliance Officer, which includes providing a quarterly written report to
  the Audit & Risk Committee regarding any alleged compliance issues, financial fraud,
  or reporting violations. (D.I. 13-1 § 2).

11

This reform, like the reform directly above, is intended to address allegations in the Complaint that the Company lacked the necessary internal controls. Nevertheless, these reforms are not a substantial departure from the status quo. Before the settlement, the Company did not have a formal Chief Compliance Officer. (D.I. 31 at 8). But its General Counsel "generally discharged the duties" required by the settlement. (*Id.*). And, the settlement allows the duties of the new Chief Compliance Officer to be discharged by the General Counsel. (D.I. 13-1 § 2). One potential change is that the reforms require the General Counsel's compliance reports always to be in writing and at least to be quarterly, which was not necessarily the practice. (D.I. 31 at 8 n. 8). Thus, the Court finds these reforms to be modest and incremental.

- Amendments to the Compensation Committee Charter. The Corporate Governance Reforms amend the Compensation Committee Charter to include requirements that the Compensation Committee take into account an executive's performance as it relates to legal compliance and compliance with internal policies when determining or approving: (i) that executive's compensation and (ii) termination benefits and/or separation pay for departing executives. (D.I. 13-1 § 7).

These reforms are intended to address allegations in the Complaint that the Individual Defendants financially benefited from their breaches of fiduciary duty by selling Company stock while it was artificially inflated by their false and misleading statements. But it is doubtful these reforms will provide a strong deterrent for potential bad behavior by executives, because these reforms "shall not affect payments or benefits that are required to be paid pursuant to the Company's plans, policies, or agreements." (D.I. 13-1 § 7). Accordingly, this reform provides a modest benefit.

- Employee Training in Risk Assessment and Compliance. The Corporate Governance Reforms require the Company to institute regular employee training concerning the Company's risk assessment and compliance, the Code of Conduct, and the Insider Trading Policy. (D.I. 13-1 § 8).

These reforms are intended to address allegations in the Complaint that certain Individual Defendants violated the Company's Code of Conduct and Insider Trading Policy. (D.I. 31 at 12).

12

Before the settlement, the Company trained new employees on these topics, but it did not have a

regular training program on these topics for current employees. (*Id.* at 10). Thus, these reforms

provide a substantial benefit. These reforms directly address allegations in the Complaint. And,

as Plaintiffs' expert reports, "Regular employee training will sensitize all Impinj's employees to

the need for legal compliance and fidelity to the Company's internal Code of Conduct." (D.I. 35-

1 ¶ 50). "This knowledge should also make it possible for potential whistleblowers to better

identify questionable conduct at the Company and report it." (*Id.*).

- Amendments to the Whistleblower Policy. As part of the settlement, the Company must amend its Whistleblower Policy to provide certain additional notifications to Impinj employees, contractors and agents—namely, that executives may be subject to criminal penalties (including imprisonment) for retaliation against whistleblowers and that whistleblowers who direct their complaints to an outside regulator or governmental entity are protected by the terms of the Policy just as if they directed their complaints internally. (D.I. 13-1 § 4).

Although these reforms might have value in the abstract, they have none in the context of

this settlement, because they do not address any harms or wrongdoing alleged in Plaintiffs'

Complaint. There are no allegations in Plaintiffs' Complaint regarding retaliation against a

whistleblower or allegations that a whistleblower was prevented or discouraged from directing

their complaint to an outside regulator. Instead, Plaintiffs allege that the Company received a

complaint from a former employee upon which the Audit Committee commenced an independent

investigation. (D.I. 1 ¶ 7). And, the former employee later withdrew the complaint from the

Occupational Safety and Health Administration ("OSHA"). (D.I. 31 at 5). The fact that the

employee filed the complaint with OSHA indicates that the Company's employees were aware of

their right to direct complaints to an outside regulator or governmental agency.

- Amendments to the Nominating and Corporate Governance Committee Charter. The Corporate Governance Reforms amend the Nominating and Corporate Governance Committee Charter to include (i) a requirement that the Nominating and Corporate Governance Committee meet with prospective new Board members; (ii) a provision that the Committee may periodically engage a corporate governance expert to review

the Company's director nomination process; and (iii) a requirement that the Committee review the Company's Corporate Governance Guidelines annually.  (D.I. 13-1 § 6).

Plaintiffs admit, "This reform was tangential to the issues in the litigation and were included in the demand letter to negotiate improving general corporate governance." (D.I. 34 at 8).  The Court itself sees no direct connection between these reforms and the harms alleged in the Complaint.  Accordingly, these reforms provide little benefit.

- Amendments to the Corporate Governance Guidelines.  The Corporate Governance Reforms amend the Company's Corporate Governance Guidelines to provide that, in order to be deemed "independent," a director must not only satisfy NASDAQ's Listing Rule 5605 and any other statutory independence requirement, but must also (i) have had no personal service contract for more than $120,000 in the preceding twelve-month period with any member of the Company's executive management, (ii) not be employed by a public company at which an Impinj executive officer serves as a director, or (iii) is not a member of the immediate family of any person described in (i) and (ii).  (D.I. 13-1 § 10).

I see little connection between these reforms and the harms alleged in the Complaint.  As if to underscore this fact, these reforms would not have changed the composition of the Board at the time of the alleged harm.  Before the settlement, the Company determined "independence" based on Listing Rule 5605.  (D.I. 31 at 11).  If the Company also employed items (i)-(iii) in its determination of director independence (which it did not at the time), the Impinj directors deemed independent during the relevant time period, July 21, 2016 through February 15, 2018, would have still been considered to be independent.  (*Id.* at 11 n. 9).   Thus, the Court finds that the reforms provide minimal benefit.

- New Board Member.  The Corporate Governance Reforms require the Impinj Board to use its best efforts to add one new independent director to the Board by the end of 2021.  (D.I. 13-1 § 9).

At the time Plaintiffs filed their complaint, the Company's board had 7 directors: its CEO Chris Diorio and 6 outside independent directors.  (D.I. 1 ¶ 22-26, 37-53, 140; Tr. 15:4-20).  One additional independent director was added before the case settled, and 2 additional independent

directors were added after the case settled, for a total of 10 directors, 9 of which are independent. (Tr. 13:8-9; D.I. 31 at 10).

I am having some difficulty in weighing the value a new independent director for this Company. In *Tile Shop*, plaintiffs argued that the appointment of a new director tipped an evenly divided six-person board to majority independent. *See* D.I. 35-7 at 26:13-19 (*In re Tile Shop Holdings, Inc. S'holder Derivative Litig.*, C.A. No. 10884-VCG (Del. Ch. Aug. 23, 2018)). But this argument was based on factual inaccuracies. At the time the initial complaints were filed, the board was composed of 8 directors. (*Id*. at 29:3-16). By the time the last complaint in the consolidated action was filed, it was 7. (*Id*.). There was no dispute that 5 of the 8 (and later 4 of the 7) directors were independent. (*Id*.). Recognizing the corrected facts, the court nevertheless found that "[t]he effect of having an independent director on a board that is even close ... is a very substantial improvement for the corporation." (*Id*. at 41:15-21). Here the appointment of a new director does not tip the board from majority dependent to majority independent. In addition, the difference between the number of independent and dependent directors is not even close.[4]

Plaintiffs contend that the addition of a new independent director will always be a substantial benefit even if a hypothetical company already has a very large board comprised entirely of independent directors and the CEO. (Tr. 17:11-18:15). I have my doubts. There has to be a point of diminishing returns. Defendants contend that "refresh[ing] or add[ing]" new directors to the Board after alleged misconduct can give the Board a more independent view of how to analyze those allegations. (*Id*. at 18:24-11). That is certainly a strong argument in a case

---

[4]     Plaintiffs cited other cases where courts approved settlements involving the appointment of a new independent director, but these rulings were presented mostly in the form of orders with no discussion of the harms alleged or the composition of the board. *See* D.I. 34 at 27-28 (citing *In re TerraForm Power, Inc. Deriv. Litig.*, No. 11898-CB (Del. Ch. Dec. 19, 2016) (D.I. 35-12) and *In re OSI Sys., Inc. Deriv. Litig.*, 2017 WL 5642304 (C.D. Cal. May 2, 2017)). Accordingly, *Tile Shop* is this Court's only basis for comparison.

where the board refreshes (or replaces) directors instead of just adding new ones. It requires closer scrutiny when the board is only adding.

Finally, Plaintiffs' have provided an expert opinion touting the consensus view that the presence of independent directors is good for companies. (D.I. 35-1 ¶ 54). Consistent with this view, the number of independent directors has increased dramatically over time, from 20% in 1950 to 75% in 2005. Jeffrey N. Gordon, *The Rise of Independent Directors in the United States, 1950–2005: Of Shareholder Value and Stock Market Prices*, 59 Stan. L. Rev. 1465 (2007). In addition, at the federal level, the Sarbanes–Oxley Act of 2002 and the listing standards for NYSE and NASDAQ require that companies with widely-held stock have a majority independent board.[5] *Developments in the Law—Corporations and Society*, 117 Harv. L. Rev. 2169, 2187 (2004).

In summary, I cannot conclude that the addition of a new independent director has no benefit. At the same time, I have reservations about concluding that a new independent director in this case provided a substantial benefit for this Company. Thus, I will settle somewhere in the middle.

The Court must now weigh the value of all these reforms together. A few of the reforms have little to no benefit, a few of the reforms have meaningful or substantial benefits, and several of the reforms have modest benefits. Accordingly, this is not a case where the benefits achieved were overwhelmingly substantial. It is also not a case where Plaintiffs achieved no benefits at all.

---

[5]     As often happens when people exclusively favor practices perceived as good, eventually someone starts to question whether too much of a good thing is still good. While not questioning that a majority of independent directors is a good thing, there are doubters that the benefits of a "supermajority" of independent directors outweigh the detriments. *See* Olubunmi Faleye, *The Downside to Full Board Independence*, MIT Sloan Management Review, 87-88 (Winter 2017); Steven Davidoff Solomon, *The Case Against Too Much Independence on the Board*, N.Y. Times, Nov. 11, 2013, available at https://dealbook.nytimes.com/2013/11/11/the-case-against-too-much-independence-on-the-board/ (last visited November 17, 2020).

Notably absent from the settlement are any consequences for the Individual Defendants who were accused of unjust enrichment or robust reforms designed to strongly deter insider trading. This could be an indication of a weakness in Plaintiffs' claims or a weakness in the benefits obtained. Plaintiffs did admit that the unjust enrichment claim faced a "larger dismissal risk." (Tr. 19:12-21:12). Given the weaknesses in Plaintiffs' claims, the Court finds that settling this action for the overall value of the benefits achieved satisfies the standard for awarding attorneys' fees. *See In re Cox Radio, Inc. S'holders Litig.*, 2010 WL 1806616, at *20 (Del. Ch. May 6, 2010) (approving settlement as fair and reasonable and awarding attorneys' fees where "the benefits gained were modest" but "the claims released were weak"). The Court now turns to the calculation of those fees.

### 2. The Calculation of Attorneys' Fees

For the Third Circuit, there are two primary methods for calculating attorneys' fees: the percentage-of-recovery method and the lodestar method. Here, because the settlement was based on corporate governance reforms and has no monetary component, the Court must apply the lodestar method. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005) (explaining that the lodestar method is applied in cases where the nature of the recovery does not allow for application of the percentage-of-recovery method); *see also In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 333 (3d Cir. 1998) ("The percentage-of-recovery method is generally favored in cases involving a common fund.").

The lodestar method multiplies the number of hours counsel worked by a reasonable hourly billing rate, resulting in a total amount called a "lodestar." *In re AT&T*, 455 F.3d at 164. A reasonable hourly rate is based on the prevailing market rates in the relevant geographic area for similar services by lawyers of comparable skill, experience, and reputation. *Maldonado v. Houstoun*, 256 F.3d 181, 184 (3d Cir. 2001). The "lodestar multiplier" equals the total fee award

17

divided by the lodestar. *In re AT&T*, 455 F.3d at 164. The lodestar multiplier can be adjusted upward or downward to account for particular circumstances, "such as the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risks involved." *Id.* at 164 n. 4.

Because this action is a consolidation of three related actions, Plaintiffs' counsel is comprised of four law firms. The Brown Law Firm, P.C., based in New York, which worked 321.7 hours for a lodestar of $191,732.50. (D.I. 35-14 ¶ 6). The Rosen Law Firm, P.A., also based in New York, which worked 188.38 hours for a lodestar of $119,925.25. (D.I. 35-15 ¶ 6). Bragar Eagel & Squire, P.C., also based in New York, which worked 144.00 hours for a lodestar of $89,537.50. (D.I. 35-17 ¶ 6). And, finally, Farnan LLP, based in Delaware, which served as liaison counsel. It worked 10.8 hours for a lodestar of $6,763.50. (D.I. 35-16 ¶ 6). Accordingly, Plaintiffs' Counsel have spent a total of 664.88 hours on this matter for an overall lodestar of $407,958.75.[6] The requested fee is 2.206 times the overall lodestar achieved by summing those numbers.[7] (*See* D.I. 34 at 29).

---

[6]     By the Court's own calculations, the 664.88 hours Counsel worked on this matter can be broken down as follows: approximately 132 hours (20% of the time) on litigation up to and including obtaining the stay, approximately 193 hours (about 30% of the time) on settlement negotiations, up to and including execution of the settlement stipulation, and approximately 340 hours (about 50% of the time) on obtaining preliminary and final approval of the settlement. These numbers are somewhat skewed because one of the law firms migrated to new billing software and in the process lost its time records for the period before the settlement. (D.I. 35-15; Tr. 30:16-31:4).

        The amount of time spent on obtaining approval of the settlement concerns me. I note that plaintiff's counsel in *In re Santander* cut off the accumulation of hours as of the date the parties signed the settlement stipulation, which raises questions about whether the same should have been done here. *See* D.I. 35-8 at 17:15-18 (*In re Santander Consumer USA Holdings, Inc. Derivative Litig.*, C.A. No. 11614-VCG (Del. Ch. Jan. 20, 2021)). The circumstances here are a bit unusual given the lost time records, but the Court sees merit in giving this issue closer scrutiny in future settlements.

[7]     Plaintiffs' Counsel calculated the overall lodestar amount as $407,537.50. (*See* D.I. 34 at 29). The difference from my calculation of $407,958.75 is immaterial. It does not materially

As described in their declarations, the work performed by the three law firms based in New York was exactly the same. (*See* D.I. 35-17 at ¶ 4; D.I. 35-14 ¶ 4; D.I. 35-15 ¶ 4). This raises questions regarding duplication of efforts. But it could also reflect the fact that the three actions were initially brought individually and the case progressed little past the consolidation stage where more division of labor would be expected. Setting that concern to one side, a careful review of each law firm's declaration shows that the number of hours worked on the tasks described and the rates charged are reasonable, taking into account the position of the timekeeper (paralegal, associate, or partner), the relevant geographic area, and the skill, experience, and reputation of the firms involved.

The Court must next determine whether the 2.21 lodestar multiplier should be adjusted upward or downward to account for particular circumstances. There are several indications that the lodestar multiplier requested here is too high.

First, the benefits obtained for the Company were overall modest. In cases where plaintiffs achieved similar benefits, the lodestar multipliers of the fees awarded were well below the 2.21 requested here. Specifically, they were 1.1 and 1.04 respectively. *See* D.I. 35-7 at 14:8-15, 43:3-11 (*In re Tile Shop*) (requesting a fee of $1.7 million which had a lodestar multiplier of 1.5 and receiving a fee award of $1.25 million, which has an implied lodestar multiplier of 1.1); D.I. 35-8 at 16:20, 17:15-22, 19:20-21 (*In re Santander*) (receiving a fee award of $1.5 million which had a lodestar multiplier of 1.04).

Second, the issues presented here were not particularly novel or complex. This action is a follow-on to a federal securities fraud class action. All the information on which Plaintiffs relied

---

impact the calculation of the lodestar multiplier, which is 2.206 with Plaintiffs' calculations or 2.208 with mine. Since I cannot account for why there is the modest difference in calculation, I will round off the proposed multiplier to 2.21.

to file their individual complaints and negotiate the governance reforms that comprised the settlement was in the public domain. (Tr. 32:20-33:6). Plaintiffs' Counsel did not have to vigorously prosecute the action in order to obtain the settlement. The only substantive work they did was file the original complaints. They did not make a books and record demand pursuant to 8 *Del. C.* § 220, draft a consolidated complaint, or face a motion to dismiss.

Third, I am concerned with rewarding somewhat redundant efforts that resulted in legal remedies with no meaningful consequences for the alleged wrongdoers. Specifically, all three law firms alleged that eight individuals committed negligent federal securities' violations, breached their fiduciary duties, and were unjustly enriched. All three law firms made the same modest effort to pursue those allegations. And all three law firms achieved the same fruitless result: The settlement recovers nothing against any of the individuals. This indicates to me an exceptionally weak case. And yet for this work, each of the three law firms ask to be rewarded with a lodestar multiplier that doubles their normal rate of compensation. "The court can adjust the lodestar downward if the lodestar is not reasonable in light of the results obtained." *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990).

Taking these facts into consideration, the Court finds that an attorneys' fee award of $424,277.10 is appropriate, which applies a lodestar multiplier of 1.04, and to which I add in the parties' unreimbursed expenses of $15,468.02 (D.I. 35 ¶ 13), for a total of $439,745.12.

## C. Service Awards

Plaintiffs have requested a "service award," also called an "incentive award," of $2,000 for each Plaintiff, amounting to $8,000 total. (D.I. 33-1 ¶ 10). The Parties propose to deduct the service awards from the attorneys' fees awarded to Plaintiffs' counsel. (*Id.*).

In federal courts, "[i]ncentive awards are not uncommon in class action litigation and particularly where ... a common fund has been created for the benefit of the entire class."[8] *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 333 n. 65 (3d Cir. 2011) (omission in original) (quoting *Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 376 (D.D.C. 2002)). "Nor is [an incentive award] necessarily compelled in each case." *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. 461, 473 (E.D. Pa. 2000). In comparison, incentive awards in Delaware state courts "should be rare" and granted "[o]nly in the exceptional case."[9] *Morrison v. Berry*, 2021 WL 2926138, at *1 (Del. Ch. July 12, 2021). Thus, federal and state courts in Delaware may have some variation in the frequency with which they grant plaintiffs incentive awards, likely attributed to the different types of class actions regularly seen in their courts, but neither federal nor state courts grant such awards automatically.[10]

"Service awards are within the discretion of the Court to approve." *Devine v. Northeast Treatment Centers, Inc.*, 2021 WL 4803819, at *9 (E.D. Pa. Oct. 14, 2021). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation," and to "reward the public service of

---

[8]    For example, "[i]ncentive payments play an important role in [Fair Labor Standards Act] litigation," *Shabazz v. Colonial Park Care Ctr. LLC*, 2021 WL 4860770, at *4 (M.D. Pa. Oct. 19, 2021), because "individuals who serve as named plaintiffs in employment rights cases do so at the risk of their current and future employment," *Caddick v. Tasty Baking Co.*, 2021 WL 4989587, at *10 (E.D. Pa. Oct. 27, 2021).

[9]    For example, in *Raider v. Sunderland*, a Delaware state court granted an incentive award of $42,400, which came out of class counsel's fee, based on "a total of 205 hours" the class representative spent mostly on matters involving his expertise in "tax and financial analyses." 2006 WL 75310, at *2.

[10]    Plaintiffs cite *In re Cendant Corp., Derivative Action Litig.*, for the proposition that incentive awards paid out from the attorneys' fees awarded to plaintiff's counsel "need not be subject to intensive scrutiny, as the interests of the corporation, the public, and the defendants are not directly affected." 232 F. Supp. 2d 327, 344 (D.N.J. 2002). But this does not suggest that a request for incentive awards should get no scrutiny.

21

contributing to the enforcement of mandatory laws." *Sullivan*, 667 F.3d at 333 n. 65 (quoting *Bredbenner v. Liberty Travel, Inc.*, 2011 WL 1344745, at *22 (D.N.J. Apr. 8, 2011)). In order "to be entitled to an incentive award," a "plaintiff must show: (1) the risks that the named plaintiff undertook in commencing class action; (2) any additional burdens assumed by named plaintiffs but not unnamed class members; and (3) the benefits generated to class members through named plaintiff's efforts." *Fry v. Hayt, Hayt & Landau*, 198 F.R.D. at 473.

Here, I do not see much basis for any service awards other than a general statement: "Each of the Plaintiffs discussed the pleadings and case strategy with their counsel. Also, they each were involved with the settlement and approved the Settlement." (D.I. 35 ¶ 94). When I review the billing time sheets, I see little communication with Plaintiffs. One New York law firm spent 5.25 hours communicating with its client, another New York law firm spent only 0.5 hours doing the same, and the last New York law firm has no record of communicating *with* its client, only communicating internally *about* the client. (*See* D.I. 35-14, Ex. 2; D.I. 35-15, Ex. 2; D.I. 35-17, Ex. 2). Thus, in the absence of any efforts by Plaintiffs to differentiate among the Plaintiffs in terms of contributions to the litigation, I will award $375 to each Plaintiff, which represents five hours of each Plaintiff's time at $75 per hour, and is probably more than is justified by the briefing. Should counsel point me to entries in the billing records that support greater involvement by Plaintiffs in the cases, or produce other information that suggests a reason for a greater award, I will consider amending the final order accordingly.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Final Approval of the Settlement is granted. The settlement as set forth in the Stipulation is fair, reasonable, and adequate and is finally approved. Plaintiffs' request for Attorneys' Fees and Service Awards is granted. The Court

awards $439,745.12 in attorneys' fees and expenses and $375 each (for $1,500 total) in service

awards to be paid from the attorneys' fees.  An appropriate order will be entered.